STATE of Utah, in the Interest of G.D., Jr., and C.D., persons under eighteen years of age,

v.

L.D., Appellant.

No. 940211–CA.

Court of Appeals of Utah.

April 27, 1995.

Paul W. Mortensen, Farmington, for appellant.

Carol L.C. Verdoia and Jan Graham, Salt Lake City, for State.

Before BENCH, GREENWOOD and WILKINS, JJ.

WILKINS, Judge:

L.D. appeals the juvenile court's judgment terminating her parental rights over her two children, G.D., Jr. and C.D. We affirm.

## BACKGROUND

L.D. and G.D., Sr. were married in 1985. At the time of the marriage, L.D. met Ken English, a close personal friend of G.D., Sr. G.D., Jr. and C.D. were born in 1986 and 1987, and in 1989 the family and Mr. English moved to Moab. Both parents are unskilled seasonal laborers, most often working as dishwashers in restaurants.

In November 1990, the Division of Family Services (DFS) in Moab received a neglect referral on the children and inspected the home. Mr. English was with the family. The housing was found to be inadequate, dirty, and obviously the product of extreme poverty, but no neglect was substantiated. The morning after the DFS visit, the family and Mr. English left town, moving to Phoenix, Arizona. They remained in Arizona for only a few weeks and then moved to Oklahoma. Again, Mr. English moved with the family. During this period, L.D. primarily cared for the children; however, G.D., Sr. and Mr. English assisted.

In March 1992, the family and Mr. English returned to Moab. DFS opened an investigation of the family in April 1992 upon referral from the Child Protection Team. After the investigation, DFS filed a shelter care petition in June 1992 based on suspicion of sexual abuse, and took custody of the children, placing them in the Children's Center in Salt Lake City.

The children were immediately examined by Dr. Palmer, a pediatrician at Primary Children's Hospital qualified to make such examinations. A vaginal examination of C.D. and an anal examination of G.D., Jr. revealed

symptoms consistent with object penetration. Dr. Palmer found no other evidence of physical abuse, and no evidence of malnutrition. However, both children had major toilet training problems, and both children were withdrawn and immature for their age.

In July 1992, DFS filed a petition to terminate the parental rights of both parents. At this time Dr. Gully, a psychologist at Primary Children's Hospital, conducted the first of two video-taped interviews of each child. Dr. Gully found neglect of hygiene and developmental delays as well as an extreme limitation of stimulation, but also found that both children could develop normally if they were in a better surrounding. Dr. Gully concluded that evidence supported the allegation that the mother had either sexually abused the children or failed to prevent such abuse.

During the fall of 1992, G.D., Sr. began to behave strangely, leaving home on one occasion and riding a bicycle to Monticello, where he called L.D. and told her that maybe he did sexually abuse C.D. On another occasion, G.D., Sr. went to Los Angeles, where he called L.D. and indicated that sexual abuse had occurred and that he wished to return home and confess. In December 1992, G.D., Sr. did confess to sexually abusing his daughter, C.D. At this time, G.D., Sr. relinquished his parental rights, pleaded guilty to the abuse in a criminal prosecution and received a prison sentence.

After G.D., Sr.'s confession, DFS began negotiating a treatment plan agreement with L.D. and her lawyer as a condition for returning the children to L.D. DFS wanted L.D. to admit in the agreement that she had sexually abused the children. She refused to admit to any sexual abuse on her part. After two months of negotiations, L.D. signed a treatment plan in February 1993. L.D. was not required by the plan to admit to her involvement in the sexual abuse of the children. However, her portion of the treatment plan was comprised of three essential elements: (1) that she sever all relationships with G.D., Sr.; (2) that she sever all relationships with Ken English, who was suspected of also abusing the children; and (3) that she enter into counseling to deal with relationships (learning to build support and affiliations with adults other than G.D., Sr. and English), with dependency (excessive dependence on G.D., Sr. and English), and with sexual abuse of the children.

In March 1993, DFS determined that the children had progressed sufficiently in the Children's Center to be placed in a foster home. The children were placed in a foster home in July 1993. They have lived in the same home since that time, and the foster parents wish to adopt them.

In September 1993, DFS filed an amended petition seeking termination of L.D.'s parental rights, due in part to her failure to comply with the treatment plan. A trial was held in the juvenile court in January 1994.

After the trial, the court found as fact that: the children had been abused; the mother was intellectually deficient; DFS attempted to work with the mother through a written treatment plan from approximately January 1993 until September 1993; the mother failed to sever all relationships with the father within a reasonable time; the mother failed to sever all relationships with Ken English within a reasonable time; the mother was unable or unwilling to continue counseling with respect to helping the children deal with sexual abuse by their father; the mother understood the treatment plan, had the ability to comply with it, and failed to comply with the plan; the mother failed to remain in Salt Lake City so that she could interact with the children more frequently; the mother was not truthful under oath; the mother had made no effort or only token efforts to support the children, to eliminate the risk of continued abuse, and to avoid being unfit; the mother had failed to become capable of providing adequate shelter, food, and clothing for the children, and she had failed to learn the necessary parenting skills; and termination of the mother's parental rights is in the children's best interests.

The trial court's legal conclusions state that the parental rights of the mother to both children should be permanently terminated on the grounds of abuse and neglect, pursuant to Utah Code Ann. § 78–3f–107(2)

(1993);[1] unfitness and incompetence, pursuant to § 78–3f–107(3);[2] failure of parental adjustment, pursuant to §§ 78–3f–107(4), –108(3), –109;[3] and token efforts, pursuant to § 78–3f–107(6).[4] However, the trial court's memorandum decision, which contains a more fully reasoned analysis of each issue, specifically states that the trial court cannot conclude by a standard of clear and convincing evidence that L.D. was involved in any abuse under § 78–3a–407(2), or that she is unfit or incompetent under § 78–3a–407(3). According to the memorandum decision, the trial court terminated L.D.'s parental rights on the grounds of failure of parental adjustment under §§ 78–3a–407(4), –407(5), –408(3), and –409. The court also found grounds for termination based on L.D.'s token efforts under § 78–3a–407(6).

The trial court, in its memorandum decision, analyzed the relevant grounds for terminating a parent's rights under the Termination of Parental Rights Act and then considered the best interests of the children. The trial court found in this regard:

> There is no question that the foster home is superior in every way to the natural mother's home. The mother failed to act when she first suspected sexual abuse. She has failed to make the parental adjustments necessary to learn parenting skills, and the best interest of the children do not allow for her to make another attempt. She has severe poverty limitations, she has no support system other than the father and Mr. English. Her prognosis is very poor relative to being able to protect the children from future harm, particularly from Mr. English. The children's reaction when the mother has contact with them shows the severe trauma to which they will be subjected if they are returned to her custody. The progress that the children have made in every respect since they were placed in the foster home attest[s] to the superiority of that home over the natural mother's home. It is clear that the children are bonding to the foster parents,

that they are living in stable, nurturing conditions, that the developmental delays have been overcome; that their hygiene is no longer being neglected, and that the foster parents are capable of providing for these children's physical, mental and emotional needs far better than the natural mother is. When the court considers the length of time that the children have been in a stable environment and the desirability of them continuing in such an environment together with the fact that the foster parents wish to adopt the children and that this foster family unit appears to be permanent, the Court has no choice other than to conclude that the best interests of the children require them to be left with the foster family....

> While the Court feels that there is no other choice, the Court is not unmindful of the tremendous blow this will be to the mother because it is clear that she loves her children and wants them back very badly. However, her own conduct over the past year and a half have made it in the children's interest to terminate the parental relationship.

The trial court terminated L.D.'s parental rights and placed the children in the legal custody of DFS for adoption.

## ISSUES ON APPEAL

L.D. challenges the following findings of the trial court: (1) that DFS used diligent efforts to reunite her with her children; (2) that she failed to cooperate in counseling; (3) that she substantially violated the treatment plan by maintaining contacts with the father and Ken English; and (4) that she had made only token efforts to keep her children.

L.D. also argues that the trial court committed reversible error by receiving evidence of the best interests of the children simultaneously with evidence of L.D.'s unfitness as a parent, contrary to statute. *See* Utah Code Ann. § 78–3a–402(2) (Supp.1994).

---

**1.** This section was renumbered in 1994 as Utah Code Ann. § 78–3a–407(2).

**2.** Renumbered as § 78–3a–407(3).

**3.** Renumbered as §§ 78–3a–407(5), –408(3), –409.

**4.** Renumbered as § 78–3a–407(6).

Furthermore, L.D. contends that the trial court committed reversible error by admitting the opinion testimony of Dr. Gully.

## FINDINGS OF THE TRIAL COURT

"Findings of fact in a parental rights termination proceeding are only overturned if they are clearly erroneous. To establish clear error and merit a reversal, an appellant must 'marshall all the evidence supporting the challenged findings and then show that despite that evidence, the findings are clearly lacking in support.'" *State ex rel. W.D., III v. W.M.*, 856 P.2d 363, 367 (Utah App.1993) (citations omitted) (quoting *State ex rel. M.S. v. Lochner*, 815 P.2d 1325, 1328 (Utah App. 1991)). L.D. has presented evidence supporting the findings throughout the statement of facts in her brief. However, she has failed to demonstrate that despite this evidence, the findings are clearly lacking in support.

According to the Termination of Parental Rights Act, a parent's rights can be terminated for "failure of parental adjustment." Utah Code Ann. § 78–3a–407(5) (Supp.1994). " 'Failure of parental adjustment' means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by the Division of Family Services to return the child to that home." *Id.* § 78–3a–403(2). "If a child has been placed in the custody of the division and the parent or parents *fail to comply substantially with the terms and conditions of a plan* to reunite the family within six months after the date on which the child was placed or the plan was commenced, whichever occurs later, that *failure to comply is evidence of failure of parental adjustment.*" *Id.* § 78–3a–408(3) (emphasis added).

For a trial court to find a failure of parental adjustment as grounds for termination of parental rights the court must find (1) that the parent was unable or unwilling to substantially correct within a reasonable time a problem which led to an out-of-home placement of the child, and (2) that DFS made reasonable and appropriate efforts to return the child to the parent's home. Both of these findings were made by the trial court, so we need only address whether the trial court had sufficient evidence to make these findings.

If a parent fails to comply substantially with a mutually agreed upon plan[5] to reunite the child with the parent, that noncompliance is evidence of "failure of parental adjustment." *Id.* It is clear from the Termination of Parental Rights Act that the agreed plan between parents and DFS is meant to be taken very seriously. *See Id.* §§ 78–3a–403(3), –408(3). Not only is a failure to substantially comply with the plan evidence of one of the grounds for termination of parental rights, but the definition of the plan itself indicates that one of the objectives of the plan can be to free the child for adoption if the parent refuses or neglects to comply. *Id.*

In the present case, the children were removed from L.D.'s home on suspicion of sexual abuse.[6] As a consequence of this removal, DFS and L.D. negotiated a treatment plan to ensure that the children would be adequately protected if they were returned to L.D.'s home. L.D., represented by an attorney throughout the process of negotiation, did not challenge the reasonableness of the plan ultimately agreed upon. The trial court found the plan to be "simple, specific and concrete." The trial court also found that L.D. failed to comply substantially with its terms. We hold that the trial court had sufficient evidence to so find.

---

**5.** A "plan" is defined by statute as

a written agreement between the parents of a child, who has been removed from his home by the juvenile court, and the Division of Family Services or written conditions and obligations imposed upon the parents directly by the juvenile court, that have a primary objective of reuniting the family or, if the parents neglect or refuse to comply with the terms and conditions of the case plan, freeing the child for adoption.

Utah Code Ann. § 78–3a–403(3) (Supp.1994).

**6.** The children's father later admitted to sexually abusing the daughter.

L.D. agreed in the plan to sever all ties with the children's father and with Mr. English. At trial, L.D. testified that her only contact with the father was to have him sign a tax refund check. The State presented evidence that she was corresponding regularly with the father (once in December, once in January, five times in February, and three times in the first seventeen days of March). When confronted with this evidence, L.D. admitted that she had in fact maintained regular contact until March 17, 1993. The State also produced evidence that L.D. was with Mr. English in Salt Lake City in April 1993. When confronted with this evidence, she admitted that she had lied about not having contacts with Mr. English.

L.D. also agreed to participate in counseling to help her prevent future harm to the children. On this issue, the trial court concluded in its memorandum decision:

> While the Court does not fault the mother for not being able to continue with counseling relative to her sexual abuse of the children when she denies all involvement and the Court cannot conclude that she was involved, the Court does find fault with her inability or unwillingness to continue counseling with respect to helping the children deal with sexual abuse by their father, and the relationship and dependency issues. The mother's former attorney and others testified that the mother understood the treatment plan and had the ability to comply with it, indeed her former attorney helped negotiate the provisions of it. And yet she chose not to comply with the plan.

The court found that L.D. failed to comply with the counseling terms of the plan by refusing to continue. We hold that there was sufficient evidence for this finding also.

█ Essentially, L.D.'s complaint is not with the trial court's factual findings—i.e., that she failed to comply with the terms of the plan. Instead, L.D.'s general complaint is that DFS suspected that she was personally involved in the abuse while negotiating the plan. L.D. argues that because of this suspicion, DFS took an adversarial posture which rendered the whole process unfair. We dis-

agree with the contention that the process was unfair.

Even if DFS did in fact take a position adverse to L.D.'s personal interests, this does not render the process unfair, nor does it mean that DFS did not make reasonable and appropriate efforts to return the children. L.D. indicates that DFS wanted her to admit to abuse of the children in the treatment plan. However, through the assistance of counsel, she was able to negotiate a plan with no admission or implication of personal involvement in abuse, the reasonableness of which plan was not challenged. Furthermore, it is reasonable and appropriate for DFS to negotiate a plan with the goal of protecting the children, as long as it provides the services necessary for the parent to meet the requirements of the plan. L.D. does not argue that DFS prevented her from complying with the plan or failed to provide services necessary for her to comply. In fact, DFS arranged and paid for L.D.'s counseling and visitation with the children, including all associated travel, telephone, and lodging expenses.

We hold that the trial court had sufficient evidence to find a failure of parental adjustment under section 78–3a–407. Because this alone is a sufficient ground for termination of L.D.'s parental rights, we need not address alternative grounds.

## FAILURE TO BIFURCATE TRIAL

█ L.D. argues that the trial court committed reversible error by receiving evidence of L.D.'s unfitness as a parent at the same time as receiving evidence of what was in the best interests of the children. This argument is based on the language of section 78–3a–402(2), which reads in pertinent part:

> [I]f a parent is found ... to be unfit or incompetent based upon any of the grounds for termination described in this part, the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered.

Utah Code Ann. § 78–3a–402(2) (Supp.1994). L.D. raises a question of the trial court's

statutory interpretation, which we review for correctness, owing no particular deference to the trial court. *State v. Larsen*, 865 P.2d 1355, 1357 (Utah 1993).

The State argues that section 78–3a–402(2) does not require a bifurcated hearing, but requires a bifurcated analysis. The State argues that the evidence of unfitness may often be intertwined with evidence of the children's best interests, and because all parental termination trials are bench trials it would be unnecessarily burdensome and a waste of judicial resources to require a bifurcated hearing. We agree with the State. The plain language of the statute does not require a bifurcated hearing, and the legislature could have so provided had this been its intent.

■ However, the statute does require an analytical bifurcation of the issues of parental unfitness and best interests of the children. In fact, it is unconstitutional to terminate a parent's rights based upon a finding of the best interests of the child without first finding that the parent is below some minimum threshold of fitness. *In re J.P.*, 648 P.2d 1364, 1374–77 (Utah 1982).

In the present case, the trial court heard all the evidence and then in an organized and disciplined fashion analyzed each of the relevant grounds for termination, finding at least one to be applicable, before analyzing the best interests of the children. After this analysis, the trial court ultimately concluded that L.D.'s rights should be terminated. We hold that the trial court did precisely what the statute requires.

### DR. GULLY'S TESTIMONY

■ L.D. argues that the trial court committed reversible error by admitting the expert testimony of Dr. Gully. L.D. claims that Dr. Gully's testimony was not based upon scientific, technical, or other specialized knowledge which would assist the trier of fact. *See* Utah R.Evid. 702. L.D. further argues that the trial court erroneously accepted Dr. Gully's testimony without the foundation required by *State v. Rimmasch*,

775 P.2d 388 (Utah 1989). We disagree with both arguments.

■ The trial court has wide discretion in determining the admissibility of expert testimony, and this court will not overturn the trial court's determination unless the trial court exceeded its permissible range of discretion. *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). It is clear that Dr. Gully had specialized knowledge which would assist the trier of fact. The trial court specifically appointed him as an expert to conduct evaluations of the children for the termination proceedings. Dr. Gully testified that he had received extensive training in interviewing children and in clinical psychology. He also testified as to his interviewing methodology, that he has used the methodology in over a thousand assessments, and that his methodology had been reviewed and approved nationally by a number of psychologists. We hold that the trial court did not exceed its permissible range of discretion to admit Dr. Gully's expert opinions.

■ Furthermore, the foundational requirements of the *Rimmasch* case are inapplicable here. *Rimmasch* dealt with the admissibility of testimony based on an external scientific process or statistical profile. *Rimmasch* requires the trial court to scrutinize the scientific or statistical principles upon which the expert's testimony is based. *Rimmasch*, 775 P.2d at 403. Dr. Gully's methodology was not a scientific process for the purpose of a *Rimmasch* analysis. Rather, it was an interviewing technique used to elicit information. Not only did the trial court receive information about Dr. Gully's technique from his testimony, but the trial court witnessed the interviews he had with the children on video tape. There was no danger in the instant case that the trial court would be unduly influenced by an unscrutinized scientific process.[7] Therefore, we also hold that the trial court did not exceed its permissible range of discretion by admitting Dr. Gully's testimony without entertaining a full *Rimmasch* analysis as there was no scientific process on which to apply such an analysis.

7. In fact, after viewing the taped interviews, the trial court concluded that they did *not* provide clear and convincing evidence that the children had been abused by L.D.

## CONCLUSION

The trial court made the necessary findings to terminate L.D.'s parental rights under the Termination of Parental Rights Act. Those findings were supported by sufficient evidence. The trial court properly bifurcated its analysis of the issues, finding first that L.D. was unfit under the statute and then considering the best interests of the children, given their present situation in a stable and loving foster home. Furthermore, it was not an abuse of discretion for the trial court to admit the testimony of Dr. Gully. Accordingly, the judgment of the trial court is affirmed.

BENCH and GREENWOOD, JJ., concur.