not fatal to the State's argument. I believe that "several feet" is a sufficient approximation of the "area from within which [appellant] might gain possession of a weapon or destructible evidence." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); *see also State v. Robalewski,* 418 A.2d 817, 823 (R.I.1980) (requiring an approximation of the distance between the arrestee and the object searched). Therefore, I believe the uncontroverted evidence establishes that the jacket was within appellant's immediate control.

**STATE of Utah, in the Interest of S.T., H.T., M.T., and C.T., persons under eighteen years of age.**

**N.T. and T.T., Appellants,**

**v.**

**STATE of Utah, Appellee.**

**No. 950289–CA.**

Court of Appeals of Utah.

Nov. 29, 1996.

Linda Q. Jones, Provo, for Appellants.

Jan Graham, Attorney General, and Carol L.C. Verdoia, Assistant Attorney General, Salt Lake City, for Appellee.

Ron D. Wilkinson, Orem, Guardian Ad Litem.

Before ORME, BILLINGS and WILKINS, JJ.

## OPINION

WILKINS, Judge:

N.T. and T.T. appeal the juvenile court's order terminating their parental rights to their four children. We affirm.

## BACKGROUND

N.T. (father) and T.T. (mother) are the natural parents of four children: C.T., M.T., H.T., and S.T. The children are now nine, eight, seven, and six years old.

The Division of Child and Family Services (DCFS) initially became involved with appellants and their children in June 1989, when a DCFS worker visited appellants' home to investigate a child abuse/neglect referral.

C.T., M.T., and H.T. were two and one-half years, one year, and one month old, respectively. S.T. had not yet been born. The worker found the house dirty and cluttered. The floor was covered with food and soiled diapers, and dirty dishes, with aged, crusted food, were piled in the kitchen. The worker reported the children, especially the baby, were so thin they appeared malnourished.

DCFS offered to provide family preservation services, which included counseling to help appellants organize and properly care for their children, visits from a homemaker, and family aid. Appellants declined the services, but on several occasions met with a counselor from the preservation unit, and accepted a vacuum cleaner and cleaning supplies. Appellants were also offered the services of the Family Support Center (Center), a twenty-four-hour crisis nursery designed to provide care for children at risk of abuse or neglect, and to provide services for families in need. DCFS encouraged appellants to use the Center, in part, so they could monitor the children's condition. DCFS directed the workers and volunteers to vigilantly record their observations and to report anything, however minor, that suggested abuse or neglect.

Appellants frequently left the children at the Center.[1] Although the Center requires parents to provide clean clothes, diapers, and bottles for the children, reports detail that the children often arrived with bottles containing sour milk and nipples with old, crusty formula. The children's clothing was often wet and dirty; sometimes the children had dried food caked in their hair and soiled bottoms. Severe diaper rashes and sores were also a constant problem. Various workers documented that the children often arrived sick with a bad cough, cold, or fever, and in some instances, head lice. The children had dark circles under their eyes and appeared extremely thin. Several reports noted bruises, burns, cuts, and bumps on the children's bodies. Some reports even noted black eyes. The children almost always arrived hungry. Because sometimes after eating, one of them would vomit or complain of a stomach ache, the Center's volunteers closely monitored the children to make sure they did not eat too much at one time.

Volunteers reported the children also exhibited significant emotional problems. At times they had bouts of uncontrollable, incessant crying, or exhibited anger towards anyone they came in contact with. The children generally seemed starved for attention, sometimes demanding to be held and other times acting withdrawn. Reports also indicated the children appeared developmentally delayed. For instance, at two years and eight months, C.T. only spoke two or three words; at fourteen months, M.T. could not stand by herself.

After receiving two more referrals in August 1989, the DCFS worker revisited appellants' home. The state of the home had not changed. The baby, H.T., appeared lethargic and very thin. The worker instructed appellants to clean the home and take H.T. to a doctor. The worker made repeat visits to the home throughout August and September. While the living conditions improved slightly, appellants never obtained medical care for H.T. After several failed promises, the DCFS worker made an appointment and transported H.T. to the doctor. The doctor found that H.T., then four months old, had only gained three pounds since birth. Because H.T.'s birth weight was average, she had since become underweight. The doctor diagnosed H.T. with "failure to thrive."

C.T. and M.T. were also evaluated by a pediatrician. C.T., at two years and nine months, was malnourished, anemic, and twenty-five to thirty percent underweight. The pediatrician noted that it is unusual to see children with inadequate nutrition because many commonly available foods are fortified. C.T. had not had any of the eleven immunizations required for children his age. In addition, C.T. also had significant developmental delays in all areas, including an eight-

---

1. When appellants had custody of their children from 1989 through 1993, they frequently used the services of the Center. The record shows that appellants left the children with the Center twenty-three days and nine nights between April and September 1989, eighty-six times between February and December 1991, and 160 times in 1992. In addition, appellants extensively used the Kid's Corral, a day care facility, between August 3 and October 18, 1991.

month delay in social skills, a twelve-month delay in motor skills, and an eighteen-month delay in expressive language skills. An average two-and-one-half year old has a vocabulary of fifty plus words; C.T. only knew two.

M.T., who was sixteen months old, was also malnourished, anemic, and significantly underweight, in addition to lacking the required immunizations. M.T. also showed severe delays in the same areas, having a four-month delay in motor skills, an eight-month delay in language, and an eight-month delay in social skills.

On November 6, 1989, appellants admitted to the State's first petition alleging neglect. DCFS took custody of the children and placed them in foster care. Appellants began their first treatment plan, which required them to secure adequate housing, maintain a clean home, participate in parenting classes, attain a psychological evaluation, and participate in weekly counseling. Father was also required to find meaningful employment.

Appellants, however, did not begin working on the treatment plan until March 1990. Even then, appellants never consistently attended counseling or parenting classes, and on several occasions were resistant to homemaking services. Appellants did meet with a family counselor in April 1990, who diagnosed both mother and father with depression. In addition, father's aptitude test resulted in a score within the range of borderline intellectual functioning; on the same test, mother scored in the ranges of average and high average.

The children resided with a foster family from November 1989 to October 1990. While appellants made little progress with the treatment plan, the children made marked developmental improvements with the foster family. After eight months of attention, stimulation, and diligent effort by the foster mother, C.T. spoke in five to six-word sentences, recognized basic shapes and colors, sang songs, rode a bicycle, held himself on a swing, and interacted well with siblings and other foster children. M.T. started talking and learned to walk and run. H.T. gained nineteen ounces the first twenty days, and after eight months, gained nine pounds, thirteen ounces.

Appellants' fourth child, S.T., was born on June 12, 1990. DCFS did not remove the child from the home. Instead, DCFS created a second treatment plan and, despite appellants' sporadic attendance at parenting and counseling classes, returned C.T., M.T., and H.T. to appellants' care in November 1990.

In March 1991, DCFS investigated another referral. The worker reported a burn on M.T.'s palm which precisely and clearly spelled "IF". Appellants claimed M.T. was burned on the stove while a babysitter was with the children; the babysitter knew nothing of the burn. The worker also reported that the children, dressed only in diapers and underpants, had an offensive odor about them. The apartment was unsanitary and had an offensive smell. Appellants reasoned that it was due to their pet messing and urinating on the floor. While noticing food and garbage on the floor, the worker observed S.T. and M.T. pick a stale piece of bread and a cookie off the floor and put them in their mouths.

In April 1991, appellants admitted to a second petition filed by the State requesting protective supervision for the children. Again, DCFS offered reunification services to help appellants improve their personal functioning and parenting skills. DCFS offered a weekly family aide counselor, homemaking services, personal counseling, weekly supervised home visits, and use of the Center. Believing the best way to keep the children safe was to provide the family with the maximum amount of day care possible, the DCFS worker also authorized 180 hours of day care at the Kid's Corral.

Appellants, however, never consistently used the offered counseling and homemaking services. They refused to answer the door to the family aide and homemaking counselors on several occasions, failed to keep several medical appointments set up for the children, and failed to change the messy, cluttered state of the home. Mother did, at times, make an effort to participate in parenting classes.

While appellants sporadically used the reunification services, they continued to frequently use the Center and the day care facility. Reports, detailing the volunteers' observations of the children, showed little sign of improvement. The children still arrived dirty, wet, hungry, and sick with colds, coughs, and fevers. They often had bruises, burns, or bumps, and appeared thin with dark circles under their eyes. On several occasions, they did not want to leave when appellants came to pick them up. In addition, M.T., H.T., and S.T., three and one-half, two and one-half, and one and one-half years of age, respectively, were all on bottles, in spite of the fact M.T. and H.T. had been weaned from bottles by their foster mother.

In October 1991, appellants were evicted from their home due to unpaid rent and destruction of property. As a result, they voluntarily placed their children in DCFS's custody. Another medical examination of the children revealed the children were frail and very underweight for their age and height. Despite the medical evidence of neglect, the children were again returned to appellants' care.

During the first six months of 1992, DCFS received no new referrals on appellants. Appellants were working regularly with the family aide and appeared to be meeting the children's needs. During this time, a doctor explained that C.T.'s tonsils may be a cause of his failure to gain weight and thus suggested they be removed. However, appellants failed to make an appointment for several months. In fact, appellants made no effort to seek medical help until DCFS required mother to set the appointment as a condition to DCFS closing the case. In addition, despite being diagnosed with occasional physical illnesses, chronic fatigue, depression, and anxiety, appellants have never been diligent in seeking medical attention for themselves, or in using DCFS's services.

C.T. began kindergarten in July 1992. Concerned because C.T. had attended only three of twenty school days, the school psychologist visited mother at home. The psychologist explained that C.T. lacked school-readiness skills and that he could not progress when he did not attend school. Mother agreed to make an effort to send C.T. to school every day. The school psychologist made seven more visits between August 1992 and January 1993, each time admonishing mother to send C.T. to school and discussing the available educational services. While mother agreed to join Participating Partners, a program designed to assist developmentally delayed children, father adamantly refused.

In October 1992, pursuant to two new referrals, the DCFS worker revisited appellants' home. The worker found appellants' living conditions had not improved; the home was filthy and unsanitary. The worker again noted that mother had missed several doctor appointments set for the children and that C.T. continued to miss school. Mother again promised to clean the home, take the children to the doctor, and make sure C.T. attended school.

In November 1992, after DCFS's prompting, mother finally took the children to a doctor. The doctor diagnosed C.T. with a slight case of pneumonia, M.T. with two ear infections, and H.T. with rheumatic fever, which resulted in heart valve damage. C.T. also continued to miss school. Between July 1992 and January 1993, C.T. missed forty-eight of the ninety-six school days.

On January 12, 1993, a DCFS worker went to appellants' home and found it posed a threat to the health and safety of the children. Animal feces, cigarette butts, stale food, and dirty diapers littered the floor, all within easy reach of the children. There were no clean linens on the dirty mattresses, and the home had a noxious odor. As a result, DCFS filed a third neglect petition; the juvenile court found the petition to be true. The children were again removed and placed in foster care. Again, reunification services were offered in an attempt to reunite the family.

Between June and September 1993, DCFS provided supervised visitation during which the children regularly visited with appellants. During this time, the children appeared to be bonded to their parents. C.T. related memories he had of appellants and comfortably discussed missing them. He was depressed,

in part, because he was homesick and wanted to go home. Several supervised visits went well, and often the children had a difficult time leaving their parents. One DCFS worker reported the children were "always excited to see their parents." In August 1993, DCFS began short unsupervised visits between appellants and the children. After three weekend visits, the children experienced a dramatic escalation in the expression of unusual fears. The fears increased and coincided with the children's knowledge that they would be returning home.

Reunification services continued until indications of possible abuse occurring during the weekend visits prompted new investigations. In January 1994, appellants were warned of the probable termination of their parental rights if existing circumstances did not change.

The State filed a petition to terminate appellants' parental rights on July 15, 1994. A thirteen-day trial was held. On March 24, 1995, the juvenile court terminated appellants' parental rights, finding: (1) appellants are unfit, substantially neglectful, and incompetent parents; (2) father is unable to care for the children's immediate and continuing physical or emotional needs for extended periods of time; (3) appellants continuously fail to meet the children's physical, emotional, and educational needs and to assume daily routine child care responsibilities, despite extraordinary services offered them since 1989; (4) appellants are unable or unwilling to correct the circumstances, conduct, or conditions leading to the removal of the children, notwithstanding reasonable and appropriate efforts by DCFS to return the children home; (5) the children's family identity is with their foster family, and the foster parents can provide stability and security for the children; (6) the children are special needs children who require extraordinary parental involvement, and the foster parents are more capable than appellants to provide them with the love, nurturing, guidance, and education they will require; and (7) it is in the best interest of C.T., M.T., H.T., and S.T. that appellants' parental rights be permanently terminated.

Appellants appeal the juvenile court's findings and order terminating their parental rights.

## STANDARD OF REVIEW

■ "The decision of a trial court to terminate parental rights will be disturbed on appeal only if the findings are clearly erroneous...." *State ex rel. T.E. v. S.E.*, 761 P.2d 956, 957 (Utah App.1988); *see* Utah R.Civ.P. 52(a). The clearly erroneous standard requires that if the findings are against the clear weight of the evidence, or if the appellate court is convinced that a mistake has been made, the findings will be set aside. *State ex rel. T.E.*, 761 P.2d at 957.

## ANALYSIS

Appellants assert the juvenile court erred in ordering the termination of their parental rights. Appellants argue: (1) the juvenile court's findings are not sufficiently detailed to provide for adequate appellate review; (2) the juvenile court failed to bifurcate its analysis of parental unfitness and the best interests of the children; (3) the juvenile court failed to specifically consider the statutory requirements of Utah Code Ann. § 78–3a–409 (Supp.1996) before terminating their parental rights; and (4) there is insufficient evidence to support the juvenile court's findings.

### I. Meaningful Appellate Review

■ First, appellants assert the juvenile court's eighty-nine findings of fact, spread over twenty-one, single-spaced pages, are insufficiently detailed to show the evidentiary basis supporting the findings, and thus meaningful appellate review of the decision is precluded. To provide meaningful appellate review, the trial court's findings must be sufficiently detailed and include enough subsidiary facts to clearly show the evidence upon which they are grounded. *Woodward v. Fazzio*, 823 P.2d 474, 477 (Utah App. 1991). "[A] trial court is not required to recite each indicia of reasoning that leads to its conclusions, nor is it required to marshal the evidence in support of them." *In re Knickerbocker*, 912 P.2d 969, 979 (Utah

1996). Contrary to appellants' contentions, a trial court is also not required to explain why it found certain witnesses less credible or why some testimony was given less weight or considered irrelevant. *See In re Estate of Bartell*, 776 P.2d 885, 886 (Utah 1989) (noting appellate courts give great deference to trial court's findings of fact, especially when they are based on evaluation of conflicting live testimony).

■ In this case, the juvenile court's findings of fact are sufficiently detailed for appellate review. The findings contain abundant subsidiary facts documenting appellants' ongoing neglect of the children from 1989 through 1994, including disturbing detail of the children's living conditions and developmental delays; the various services offered to assist the family; and appellants' continual inability to provide for the children's physical, emotional, medical, and educational needs. We understand the juvenile court's difficult burden of distilling thirteen days of evidence into a few detailed paragraphs of actual facts. However, the findings in this case may be slightly too detailed for efficient appellate review. In preparing findings of fact, the juvenile court must provide detailed and accurate findings that both report the facts found true and support the ultimate judgment. The court, however, is not always required to recite in detail allegations presented and ultimately rejected as not factual.

We recognize that findings of fact serve multiple purposes. Appellate review is only one of those purposes; informing the parties of the reasoning employed by the trial court is another. In a case involving the permanent termination of parental rights, we are certainly prepared to sacrifice some efficiency in appellate review to facilitate the clear communication of the decision reached and the factual and legal justification for that decision. We acknowledge that the first obligation of the trial court is to see that justice is done for those appearing before it. However, we also note that while a complete explanation of the reasoning and support for the judgment reached by the trial court is vital, care must be exercised in the preparation of formal findings and conclusions to avoid obscuring the sound basis upon which

the decision is reached. The findings in this case tend in that direction. Nonetheless, they clearly are sufficient to allow appellate review.

## II. Bifurcating Analysis

■ Second, appellants claim the juvenile court failed to bifurcate its analysis because it did not consider evidence of parental unfitness before considering evidence of the children's best interest. A juvenile court is required to bifurcate its analysis of the grounds for termination and the best interests of the children because parental rights cannot be terminated solely upon a finding that such action is in the best interests of the children. *State ex rel. G.D. v. L.D.*, 894 P.2d 1278, 1284 (Utah App.1995). However, contrary to appellants' contentions, bifurcating the analysis does not require courts to separately hear and consider evidence pertaining to unfitness and best interests. Instead, bifurcation requires courts to first find statutory grounds for termination before considering whether termination is in the children's best interest. *See* Utah Code Ann. § 78–3a–402(2) (Supp.1996).

■ In this case, the juvenile court properly heard all the evidence, analyzed each of the relevant statutory grounds for termination, and found several grounds applicable. After finding grounds to terminate appellants' parental rights, the court then found that continuing the children's foster care placement was in their best interests. *See, e.g., State ex rel. G.D.*, 894 P.2d at 1284 (noting juvenile court properly heard all evidence, analyzed each relevant ground for termination, and found several grounds applicable before considering children's best interests).

Here again, however, we encourage juvenile courts faced with this bifurcated analysis requirement to consider using care in describing the bifurcated analysis and the resulting conclusions. Although it is not error to include findings on all issues in a single compilation, our review, and likely the juvenile court's analytical process, would be aided by delineating between the two issues in the findings and the conclusions. We do not suggest two different sets of findings and

conclusions are required, each set addressing one part of the bifurcated analysis. However, to the degree that the evidence and trial process permit, findings and conclusions that clearly show the bifurcated analysis process will assist our review, and will prevent needless reversal or retrial of already tragic cases.

### III. Consideration of Required Statutory Factors

■ Third, appellants claim the juvenile court failed to consider required factors listed in the statute now codified as Utah Code Ann. § 78–3a–409 (Supp.1996). The statute requires courts, in determining whether parental rights should be terminated, to consider the reunification services offered; the children's physical, mental, and emotional condition and needs; and the parent's efforts to change conduct, conditions, or circumstances to make it in their children's best interest to return home. *Id.* While the juvenile court did not expressly refer to the statute when considering these factors, the court's findings are replete with detailed discussion of the offered services, the children's conditions and needs, and appellants' efforts. Thus, the juvenile court properly considered each statutory factor prior to terminating appellants' parental rights.

### IV. Sufficiency of the Evidence

■ Appellants' final assignment of error concerns the sufficiency of the evidence supporting the juvenile court's findings and ultimate decision to terminate their parental rights. Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous. Utah R.Civ.P. 52(a); *State ex rel. E.D. v. E.J.D.*, 876 P.2d 397, 402 (Utah App.), *cert. denied*, 890 P.2d 1034 (Utah 1994). To establish clear error and thereby merit reversal, an appellant " 'must marshall the evidence in support of the findings and then demonstrate that despite this evidence, the [juvenile] court's findings are so lacking in support as to be against the clear weight of the evidence.' " *Id.* (quoting *In re J.D.M.*, 808 P.2d 1122, 1124 (Utah App.1991)). Successful challenges to findings of fact must demonstrate

to appellate courts first how the trial court found the facts from the evidence, and second why such findings contradict the weight of the evidence. *Oneida/SLIC v. Oneida Cold Storage & Warehouse, Inc.*, 872 P.2d 1051, 1053 (Utah App.1994). Successful challenges can also "induce a definite and firm conviction that a mistake has been made." *State ex rel. N.H.B.*, 777 P.2d 487, 493 (Utah App.), *cert. denied*, 789 P.2d 33 (Utah 1989).

■ While appellants have made an attempt to marshal the evidence, they have not established clear error in the juvenile court's findings. After reviewing the record, we conclude there is ample evidence to support the juvenile court's findings that appellants are unfit, neglectful, unable or unwilling to change the conditions requiring the removal of their children, and unable to meet the children's physical, emotional, and educational needs.

The evidence reveals that while in appellants' care, the children lived in unhealthy and unsanitary conditions. The children were dirty, hungry, underweight, malnourished, and developmentally delayed. In addition, appellants frequently missed doctor appointments scheduled for the children, and only because of DCFS's prompting did the children receive medical care. Appellants were unable to consistently send C.T. to school and would not participate in educational programs offered to improve C.T.'s academic deficiencies. Despite the reunification services offered by DCFS, including several treatment programs, homemaking services, personal counseling, parenting classes, day care services, and the services of a family aide, appellants failed to make any substantial effort to change their living conditions or improve their parenting skills. Appellants also were unable or unwilling to seek medical help or psychological services for themselves to enable them to adequately care and provide for their children.

The evidence further shows that while in the care of their foster parents, the children gained weight and made marked developmental improvements in their language, social, and motor skills. The facts also establish that when the children were returned to

appellants, they regressed physically, emotionally, and developmentally.

Since 1993, C.T., M.T., H.T., and S.T. have lived with the same foster family they were originally placed with in 1989. The children have expressed a desire to continue living with their foster parents. In addition, C.T. has discussed being adopted by them. These children deserve a stable, structured environment with parents able to nurture, love, and provide for their special needs. Appellants' passive parenting style cannot accommodate the children's basic needs, let alone the extraordinary care these children require. Thus, the evidence also supports the finding that termination of appellants' parental rights, and the children's continued placement with their foster family, is in the children's best interests. Because the evidence of neglect and parental unfitness is so abundant, we are convinced that no mistake has been made.

■ Appellants contend that given the evidence in support of and contrary to the findings, the court could have reached the opposite conclusion. The mere fact that we could reach a different result than the juvenile court on the same evidence does not justify setting aside the juvenile court's findings. *See In re J.C.O. v. Anderson,* 734 P.2d 458, 462 (Utah 1987) ("[I]f the evidence is such that reasonable minds may differ as to the conclusion to be drawn therefrom, it is the prerogative of the trier of facts to make the determination; and this Court should not interfere with that prerogative by disagreeing with the determination thus made.").

We acknowledge the love appellants have for their children, as found by the juvenile court. Yet, the evidence shows that for over seven years, appellants have made no substantial effort to change their conduct or living conditions to provide these children with basic necessities and stability, and the children show a remarkable lack of developmental and emotional progress when in appellants' care. As a result, it is the judgment of the people of Utah, as expressed by statutes enacted by the legislature, that under these difficult circumstances, termination of appellants' parental rights is necessary.

We therefore affirm the juvenile court's order terminating appellants' parental rights.

ORME, P.J., and BILLINGS, J., concur.