945 P.2d 158 (1997)
STATE of Utah, in the Interest of T.J., A.H., and K.H., persons under eighteen years of age.
B.J.H., Defendant and Appellant,
v.
STATE of Utah, H.R., and B.R., Plaintiffs and Appellees.
No. 960293-CA.
Court of Appeals of Utah.
September 11, 1997.
*159 Gary L. Bell, Salt Lake City, for Natural Mother.
Jan Graham and Jeffrey S. Buckner, Salt Lake City, for Appellee State of Utah.
Kellie F. Williams, Salt Lake City, for Plaintiffs and Appellees H.R. and B.R.
Martin N. Olsen, Midvale, Guardian Ad Litem.
Before WILKINS, Associate P.J., and BILLINGS and ORME, JJ.

OPINION
BILLINGS, Judge:
Appellant B.J.H. challenges the trial court's order terminating her parental rights to her three children T.J., A.H., and K.H. Specifically, appellant claims the petitions filed by the State and H.R. and B.R., the foster parents of K.H., were barred by the doctrine of res judicata. Appellant also claims the evidence was insufficient to terminate her parental rights. We affirm.

FACTS
Appellant is the mother of three children, T.J. (born 2/9/86), A.H. (2/27/92), and K.H. (10/7/93). In late summer or early fall of 1993, appellant placed T.J. in the custody of her sister, who lived in Colorado. Appellant asked her sister to take care of T.J. until the birth of K.H. and until appellant secured permanent housing. Several weeks later appellant and her sister got into an argument over T.J.'s custody. Soon thereafter, appellant's sister returned T.J. to Utah, but when she could not locate appellant she took T.J. to the South Jordan police. Apparently appellant could not be found because she had gone to Colorado to pick up T.J. When the police could not locate appellant, they delivered T.J. into shelter care. Soon thereafter, appellant returned and requested that A.H. also join T.J. in shelter care.
In its investigation, the Division of Family Services (DFS)[1] learned T.J. had missed excessive days of school and her parents had failed to assist in solving the problem; the parents failed to provide the children with a stable home; and the parents engaged in domestic violence in the presence of the children. As a result, DFS petitioned for protective supervision of the children. Several days later, on the condition that appellant stabilize her housing situation, the children were returned to appellant's physical custody while DFS retained legal custody.
During this same time period, appellant was pregnant with K.H. Prior to K.H.'s birth, appellant contacted two families to see if they wished to adopt her unborn daughter. Both *160 were interested and both gave appellant and her boyfriend money to help with living expenses. In fact, appellant signed a document entitled Relinquishment of Child in which she voluntarily and unconditionally agreed to release custody of the child, expected to be born in October, to the second family. Appellant changed her mind and ultimately told both families that she did not wish to let them adopt the child.
Once the child, K.H., was born, appellant placed K.H. with the foster family (foster family) while she recovered from delivery complications. K.H. has resided with the foster family ever since. On November 4, 1993, DFS learned that appellant and her boyfriend had been asked to leave the boyfriend's mother's house. About one week later, the DFS worker, Shirley Sutton, located appellant and reviewed a protective supervision treatment plan with her. This plan was to run between October 1993, and April 1994. On the following day appellant and her boyfriend became involved in a domestic dispute. As a result of this altercation, DFS filed a petition for custody of appellant's three children. This petition was granted, and the State immediately put K.H. in the custody of the foster parents.
Because of this change in custody, the State developed a new treatment plan which was to run between November 1993, and May 1994. Sutton, the DFS caseworker, ultimately determined that appellant had not substantially complied with this plan. Specifically, appellant had failed to obtain a stable living environment and had failed to comply with the family therapy requirement. During this time, appellant and her boyfriend lived in a camper or a hut.
The case was ultimately transferred to Margo Halliday on February 17, 1994. Halliday then developed a third treatment plan which appellant signed on March 11, 1994, and which was to run until May 1994. This plan increased the compliance requirements from the previous plan, but had essentially the same elements. Halliday determined that appellant had substantially failed to comply with the requirement of this treatment plan by failing to address the issue of domestic violence and failing to obtain stable housing. During the time period of this plan the Family Support Center was forced to terminate in-home services because appellant failed to keep her appointments. Also during this time, and during the entire course of DFS custody of the children, appellant's visitation of the children was sporadic.
Soon after the previous treatment plan ended, a fourth plan was created and ran from May 1994 until September 1994. Again at the end of the treatment plan, Halliday determined that appellant had failed to substantially comply with the treatment plan because appellant had failed to establish attendance at domestic violence classes and because she had discontinued her participation in peer parenting classes. Unbeknownst to the State, during this time and some ten months after the birth of K.H., appellant signed a voluntary relinquishment and consent form for the adoption of the child by a separate family. Appellant claimed that the foster parents were no longer adequate to take care of K.H. Despite appellant's efforts, K.H. remained in the custody of the foster parents.
After appellant failed to comply with this last plan, a fifth treatment plan was created; its goal was changed from having the children placed back with appellant to having them adopted. This treatment plan was to run between September 1994, and March 1995. This plan, besides once again requiring stable housing, also required appellant to attend domestic violence and anger management classes. During the time of the plan, appellant was homeless or living with friends and did not tell DFS of her whereabouts, admittedly partly because of an antagonism she had towards Halliday. Ultimately, Halliday again determined that appellant had not complied with the plan.
On December 5, 1994, the Guardian Ad Litem's office filed a petition to terminate appellant's parental rights alleging neglect, parental unfitness, failure to remedy circumstance causing an out-of-home placement, and token efforts. Prior to trial, a family wishing to adopt K.H. (prospective family) filed a motion to intervene and sought to have K.H. pre-placed with them pending the outcome of the trial. This motion to intervene *161 was granted, although the trial court denied the prospective family's request for pre-placement. As a result of the prospective family's motion, the foster parents of K.H., who also wished to adopt K.H., filed their own motion to intervene. This motion was also granted. Soon thereafter, the prospective family filed a motion to have the termination proceedings dismissed as to K.H. and to have adoption proceedings begun. The foster parents opposed the motion. The trial court quickly held a hearing on the matter and denied the motion. This was the only participation of the foster parents in the first termination of parental rights proceeding.
In June 1995, Halliday prepared a sixth treatment plan that contained many of the same elements as the earlier plans. This plan was to run until September 1995. During the course of the plan, appellant told Halliday that she would not comply with some of the treatment objectives because she felt she did not need them. As a result, Halliday again determined that appellant failed to comply with the plan.
The trial on the Guardian Ad Litem's petition was held June 19-21, 1995. During this first trial, appellant moved to exclude the Attorney General's office from participating at the trial because they were not a party. This motion was denied. However, during trial the juvenile court began to "severely limit" the questioning of the lawyer from the Attorney General's office. She was "only allowed to ask questions that related directly to DFS services rendered in this case."
Following the trial, the juvenile court determined that there was not clear and convincing evidence that appellant's parental rights should be terminated. On August 29, 1995, the foster parents filed a petition to terminate appellant's parental rights as to K.H. on the same grounds as the previous petition alleged, as well as abandonment and failure of parental adjustment. About three weeks later, the State also filed a petition to terminate appellant's parental rights as to all three children, again alleging the same grounds relied upon in the first trial and the additional claim of failure of parental adjustment.
Following the first trial, a new case worker, Jamie Hayden, was assigned to appellant's case. She met with appellant and prepared a new treatment plan to run from September 1995, to March 1996.
The second trial was held between January 29, and February 15, 1996. At this second trial, Hayden testified that appellant had not substantially complied with the plan and the same concerns existed as had at the time the children were first removed. Specifically, she testified that appellant had not learned appropriate anger management and conflict resolution skills despite being offered anger management classes; she had not learned appropriate parenting skills despite being offered parenting classes, and she had failed to provide permanent and stable housing and income to provide for the needs of the children. The juvenile court made extensive findings on appellant's failure to comply with the plan and determined that Hayden had always been available, diligent, and conscientious.
The juvenile court also heard testimony from two therapists. Dr. Jensen testified that appellant was narcissistic, putting her needs ahead of those of her children. She also testified that appellant needed therapy, parenting classes, and domestic violence classes (all of which had been offered by the State) in order to be able to parent appropriately in the future. Dr. Nosanchuck, appellant's therapist at the time, testified that it would be inappropriate and irresponsible to return the children to appellant and that it would take up to two years to remedy appellant's parenting problems so that she could regain custody.
Following the second trial, the juvenile court terminated appellant's parental rights to all three children. The court expressly found that appellant's justifications for failing to comply with the treatment plans were not credible and that DFS had provided appropriate and diligent services in an attempt to reunite appellant with her children.

ANALYSIS

I. Res Judicata
Appellant claims the trial court erred in allowing relitigation of claims barred by the *162 doctrine of res judicata. Respondents contend that the claims raised in the second trial were not barred under traditional res judicata analysis. They further argue that even if the claims are barred under traditional res judicata analysis, because of the unique nature of parental rights termination proceedings, traditional res judicata analysis should not apply. Because we determine that the claims made in the second termination proceeding were not barred under a traditional res judicata analysis, we need not reach the issue of whether different notions of res judicata should be applied in termination of parental rights proceedings.[2]
"The doctrine of res judicata `is based on the premise that the proper administration of justice is best served by limiting parties to one fair trial of an issue or cause.'" In re J.J.T., 877 P.2d 161, 162 (Utah Ct.App.1994) (quoting Mel Trimble Real Estate v. Monte Vista Ranch, Inc., 758 P.2d 451, 453 (Utah Ct.App.1988)). Res judicata has two distinct but related branches: (1) claim preclusion, which bars the relitigation of claims that have been previously litigated between the same parties, and (2) issue preclusion, or collateral estoppel, which "prevents relitigation of issues that have been decided, though the causes of action or claims for relief are not the same." Id. at 163.

A. Claim Preclusion
The claim preclusion branch of res judicata requires three elements:
"First, both cases must involve the same parties or their privies. Second, the claim that is alleged to be barred must have been presented in the first suit or must be one that could and should have been raised in the first action. Third, the first suit must have resulted in a final judgment on the merits."
Id. (quoting Madsen v. Borthick, 769 P.2d 245, 247 (Utah 1988)). We conclude that claim preclusion does not bar the second termination proceeding as the State was not a party or in privity with a party in the first proceeding.
The first action to terminate the parental rights of appellant and her then boyfriend and now husband was filed by the Office of the Guardian Ad Litem, the only named party prosecuting the action. The second petition to terminate the parental rights of appellant to K.H. was filed by the foster parents on August 29, 1995. Subsequently, the State filed another petition to terminate appellant's parental rights as to all three children. These petitions were consolidated for trial.
The State, or more precisely, DFS as represented by the Attorney General's office, was not a named party in the first action. However, it is clear that if a party has control of or substantially participates in an action, that person may be deemed a party for purposes of res judicata. See Restatement (Second) of Judgments § 39 ("A person who is not a party to an action[3] but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." (footnote added)).
The State participated, but only to represent its client, DFS, when workers were *163 questioned about services they provided. The State was not allowed to question the actions of appellant or to inquire into the best interests of the children.[4] Certainly, the State did not have the ability to control the action. See State ex rel. Dep't of Soc. Serv. v. Ruscetta, 742 P.2d 114, 117 (Utah Ct.App.1987) (stating ability to control representation of rights is "necessary to fulfill function of privity to provide a day in court"). Because the State had a limited role in the first proceeding, it did not have a fair opportunity to litigate the issues. See Throckmorton v. Throckmorton, 767 P.2d 121, 123 (Utah Ct.App.1988) ("When there has been an adjudication, it becomes res judicata as to those issues which were either tried and determined, or upon all issues which the party had a fair opportunity to present and have determined in the other proceeding.").
Finally, res judicata applies against a person or entity if that person or entity is in privity with a party to the original action. See In re J.T.T., 877 P.2d at 163. A person is in privity with another when that person is "so identified in interest with another that the same legal rights are represented." State ex rel. Dep't of Soc. Serv., 742 P.2d at 117.
In this case, no privity exists between the Guardian Ad Litem and the State, through DFS, because the two represent different interests. The Office of the Guardian Ad Litem, while a creation of the State, represents not the interests of the State but those of the children. See Utah Code Ann. § 78-3a44.5(2) (1996). On the other hand, DFS and the Attorney General's office protect the interests of the State. While many times the interests of the children and the interests of the State may be the same, they are distinct and can differ. Thus, because "`there are important differences in the authority of the representative agencies,'" privity does not exist between the agencies. Holmberg v. State Div. of Risk Management, 796 P.2d 823, 827-28 (Alaska 1990) (citation omitted) (stating preclusion may be defeated when functions of agencies differ significantly and one agency does not have authority to represent interests of another). See also Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403, 60 S.Ct. 907, 916, 84 L.Ed. 1263 (1940)("The crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy."); cf. Department of Public Aid v. Wheeler, 248 Ill.App.3d 749, 188 Ill.Dec. 741, 743, 618 N.E.2d 1311, 1313 (1993) (holding in paternity actions children and public agencies providing support to children not in privity with mothers for purposes of filing new paternity action).[5]
We conclude claim preclusion does not bar the State's petition to terminate appellant's parental rights as the State was not a party to the first action, did not control the first proceeding, nor was it in privity with the Guardian Ad Litem.

B. Collateral Estoppel
Issue preclusion, or collateral estoppel, "involves two different causes of action and only bars those issues in the second litigation necessarily decided in the first." State ex rel. Dep't of Soc. Serv., 742 P.2d at 116. Utah courts have developed a four-part test for the application of collateral estoppel:
"1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
2. Was there a final judgment on the merits?
3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
4. Was the issue in the first case competently, fully, and fairly litigated?"
*164 Id. (citation omitted). This issue is resolved by our prior determination that the State was not a party or in privity with a party in the first termination proceeding. Since this is an essential element of collateral estoppel, appellant's issue preclusion claim also fails.

II. Sufficiency of the Evidence
Appellant claims there was not clear and convincing evidence presented at the second proceeding that appellant's rights to her three children should be terminated. "Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." In re S.T., 928 P.2d 393, 400 (Utah Ct.App.1996). Further, in order to make a successful challenge of the sufficiency of the evidence, an appellant "`must marshall [sic] the evidence in support of the findings and then demonstrate that despite this evidence, the [juvenile] court's findings are so lacking in support as to be against the clear weight of the evidence.'" State ex rel. E.D. v. E.J.D., 876 P.2d 397, 402 (Utah Ct.App.1994) (quoting In re J.D.M., 808 P.2d 1122, 1124 (Utah App.1991)). Thus, "[s]uccessful challenges to findings of fact must demonstrate to appellate courts first how the trial court found the facts from the evidence, and second why such findings contradict the weight of the evidence." In re S.T., 928 P.2d at 400. In this case, appellant points to no evidence in the record that would contradict the findings and conclusions of the trial court but simply reargues the same points she argued to the juvenile court. Thus, we affirm the trial court's termination of appellant's parental rights as to all three children.

CONCLUSION
We conclude the juvenile court correctly determined that res judicata did not apply to bar the second termination action. We further conclude that appellant has failed to demonstrate how the findings of the trial court supporting the termination of her parental rights are contrary to the weight of the evidence. The judgment of the trial court is therefore affirmed.
ORME, J., concurs.
WILKINS, Associate Presiding Judge (concurring):
I fully concur in the opinion of the court. However, in the interests of allowing finality to come with all deliberate speed to judgments resulting in the termination of the parent-child relationship, I write separately to suggest an alternative analysis.
I believe this case also can be resolved by careful review of one of the other essential requirements of res judicata: Whether the same "claim" or "issue" is addressed by the trial court in both instances. For claim preclusion to apply, "`the claim that is alleged to be barred must have been presented in the first suit or must be one that could and should have been raised in the first action.'" In re J.J.T., 877 P.2d 161, 163 (Utah Ct.App. 1994) (quoting Madsen v. Borthick, 769 P.2d 245, 247 (Utah 1988)). For issue preclusion to apply, "the issue decided in the prior adjudication [must be] identical with the one presented in the action in question." State ex rel. Utah State Dep't of Soc. Servs. v. Ruscetta, 742 P.2d 114, 116 (Utah Ct.App. 1987); see also Searle Bros. v. Searle, 588 P.2d 689, 691 (Utah 1978).
In this action, as in other parental rights termination actions that raise claims of res judicata, the claims are practically never the same, nor are they likely ever to be. The central claim is not simply, "Should the parental rights of Parent be terminated?" More accurately and precisely put, the question before the trial court in all circumstances is one of, "Should the parental rights of Parent be terminated at this time, based upon both the history of this parent's behavior and the impact on the child?" If any appreciable time has passed between the first and second date upon which the juvenile court is asked to make a judgment on a petition seeking termination of parental rights, then as a matter of law the claim is necessarily and materially a different one than that previously tried. The claim is dramatically dependant on the time perspective from which the trial court views the evidence of the parent-child relationship, the parent's behavior, and the child's best interests.
*165 I would hold on the facts of this case that res judicata as a doctrine certainly applies to termination actions, but that as a matter of law the claim alleged to be barred here was not presented in the first suit, nor could it have been, and that the issues relating to termination are not and cannot be identical to those presented in the first action. This is so simply because the claims involve the condition of both the parent and the parent-child relationship as of different dates. Since the dates of the first and second trials will always be different, and since the claims are materially date-dependent, the claims presented will always be different in this type of case. This is true even when the parties are identical, and the only issue litigated in both cases is whether or not the parental rights of a parent are to be terminated with respect to the same child or children.
As I understand the doctrine of res judicata as adopted in Utah, it may well apply to a parental rights termination action brought after a prior parental rights termination action has been adjudicated. However, although res judicata applies for purposes of analysis, as a practical matter it will never act to bar the second action.
NOTES
[1] The Division of Family Services is now known as the Division of Child and Family Services.
[2] This court in In re J.J.T., 877 P.2d 161, 164 (Utah Ct.App.1994), although leaving unanswered the precise question of how res judicata applies in parental termination cases, stated that "to effectively determine the best interests of a child, a court must be free from the imposition of artificial constraints that serve merely to advance the cause of judicial economy." Further, "determining whether the circumstances of child abuse or abandonment justify terminating parental rights is not the type of `needless litigation' contemplated by the doctrine of res judicata." Id. In that vein, we note many states have concluded that a strict application of res judicata in parental termination proceedings is not warranted. See, e.g., In re J.R., 711 P.2d 701, 703 (Colo.Ct. App.1985); In re Juvenile Appeal, 190 Conn. 310, 460 A.2d 1277, 1282 (1983); In re A.S., 12 Kan. App.2d 594, 752 P.2d 705, 711 (1988); In re V.B., 220 Neb. 369, 370 N.W.2d 119, 122 (1985); In re Newman, 49 Or.App. 221, 619 P.2d 901, 905 (1980). These states recognize that "[a]lthough the policy of limiting litigation is sound, that policy should not be applied so as to deprive the state in its role as parens patriae from seeking a resolution which will best serve the interests of the children." In re J.R., 711 P.2d at 703.
[3] The Restatement Second of Judgments § 34(1) defines party to an action as "[a] person who is named as a party to an action and subjected to the jurisdiction of the court."
[4] Although we have no record of the first proceeding, appellant offers no evidence contradicting the affidavit of the State's attorney to this effect.
[5] We need not separately address the issue of whether the foster parents' petition to terminate appellant's parental rights was barred by res judicata. The petition of the State and the petition of the foster parents were consolidated for trial. Because we determine the State's petition was not barred by res judicata, the proceedings were proper.