STATE of Utah, in the Interest of M.W. and S.W., persons under eighteen years of age.

L.A.W., Appellant,

v.

State of Utah, Appellee.

No. 951412–CA.

Court of Appeals of Utah.

Dec. 17, 1998.

James C. Haskins, Haskins & Associates, and Thomas P. Isom, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen. and Carol L.C. Verdoia, Salt Lake City, for Appellee State of Utah.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Stacey G. Schmidt, Utah Legal Services, Inc., Provo, and Paul S. Felt, Ray Quinney & Nebeker, Salt Lake City, for Appellee A.M.

Before BILLINGS, GREENWOOD, and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

L.A.W. appeals the juvenile court's order granting permanent sole custody of her children, M.W. and S.W., to their maternal grandmother, A.M. We affirm the juvenile court's determination that the parental presumption was rebutted, but reverse and remand for further proceedings to determine the issue of custody in the children's best interests.

## BACKGROUND

L.A.W. is the father of M.W., born on March 17, 1987, and S.W., born on January 20, 1991. L.A.W. and W.M., the children's mother, married in 1986. Both L.A.W. and W.M. are legally blind, and L.A.W. is also partially deaf. L.A.W., a hermaphrodite, has a full set of both male and female sex chromosomes and had both male and female physical characteristics.

During the summer of 1992, L.A.W. began dressing and presenting herself as female in anticipation of gender-corrective surgery that would render her more definitively female. Over the course of the year before surgery, L.A.W. and W.M. spoke with the children approximately three times concerning the surgery.

During this same period, neighbors noticed that on several occasions, M.W. would go to a neighbor's house after school because no one was at her house to care for her. At times, L.A.W. also left M.W. alone to care for her younger sister, S.W.

In addition, neighbors noticed that L.A.W. was often careless when walking the children across busy intersections. L.A.W. sometimes yelled at her children in a loud voice, and M.W. spoke often of a "hiding tree" behind which she would hide from L.A.W. Sometimes M.W. appeared at a neighbor's

house before going to school, ungroomed and in clothes unsuited for the season. At about this same time, M.W. began to exhibit sexualized behavior. Although L.A.W. and W.M. were aware of this behavior, neither parent explored the possibility that M.W. might need professional attention.

In March 1993, W.M. filed for divorce. The divorce was granted on April 9, 1993, with L.A.W. and W.M. stipulating to joint custody of the children and to an arrangement in which both parents would remain in the same home but live on separate floors.

In May 1993, W.M. left Utah to work as a temporary employee at Mount Rainier National Park for the summer. By this time, a neighbor was watching the children three to five times a week during the day, normally for several hours at a time. Although the children were sometimes left with a neighbor while L.A.W. ran errands, there were also times when the children were taken to the neighbor's home even though L.A.W. was at home.

On June 3, 1993, L.A.W. sent M.W. to Arkansas to stay with M.W.'s maternal grandmother, A.M. On July 26, 1993, L.A.W. took S.W. to Arkansas to join M.W. at their grandmother's home. L.A.W. then went to Canada, where she had gender-corrective surgery on August 1, 1993.

Meanwhile, on July 28, 1993, A.M. took S.W. to a doctor in Arkansas, who reported evidence that S.W. had been sexually abused. Around the same time, M.W. told A.M. that she had also been sexually abused and identified L.A.W. as the perpetrator. When A.M. returned the children to Utah on August 27, 1993, the Division of Family Services [1] (DFS) took the children into protective custody. On August 31, 1993, the juvenile court granted temporary custody to A.M. and W.M., pending the outcome of further proceedings.

On September 7, 1993, W.M. filed a petition in district court to modify the joint custody provision of the divorce decree and requested sole custody of the children. L.A.W. filed a counter-petition requesting that the court grant her sole custody. A.M. then moved to intervene in the custody modifica-

tion proceedings, and filed her own petition for custody, asserting that neither parent was fit to care for the children.

On September 10, 1993, Dr. Marty Palmer of the Primary Children's Medical Center in Salt Lake City examined the children and substantiated that S.W. had been sexually abused. On September 15, 1993, the children were placed solely with A.M. L.A.W. was allowed supervised visits with S.W. However, due to M.W.'s strong desire not to see L.A.W., visitation with M.W. was allowed only upon recommendation by M.W.'s therapist.

On January 28, 1994, the district court granted A.M.'s Motion to Intervene and certified the three custody petitions to the juvenile court.

At a hearing on February 9, 1994, the juvenile court adjudicated the children neglected after L.A.W. and W.M. admitted that (1) "[M.W.] has been sexually abused and [S.W.] may have been sexually abused, by a person or persons whose identity is unknown"; (2) "[M.W.] is fearful of [L.A.W.] and actively resists any contact with [L.A.W.]"; (3) "[o]n several occasions during 1992, when [M.W.] returned home from school, neither one of her parents were home to receive her"; and (4) "[o]n numerous occasions during 1992 and 1993, [L.A.W.] has endangered [M.W.] and [S.W.] by requiring them to be on or cross busy streets in an unsafe manner."

From the end of 1993 through 1994, the family variously participated in group, family, and/or individual therapy and psychological evaluations. However, L.A.W. spent an inordinate amount of time in those sessions on her own issues instead of issues concerning her children and her ability to care for them.

The trial on the three custody petitions spanned five days—November 28, 29, and 30, 1994, and January 17 and 18, 1995. During the trial, the juvenile court repeatedly requested that the parties restrict their evidence to that addressing the three factors that must be demonstrated for a nonparent to overcome the presumption that a child's

---

1. The Division of Family Services is now named the Division of Child and Family Services.

best interests are served by placement with his or her natural parents. *See Hutchison v. Hutchison,* 649 P.2d 38, 40 (Utah 1982). On May 22, 1995, in a Memorandum Decision, the juvenile court concluded that A.M. had successfully rebutted the parental presumption and determined that the children's best interests would be served by awarding permanent custody to A.M.

This appeal followed.

## ISSUES

Although L.A.W. raises numerous issues on appeal, we discuss only three: (1) whether the juvenile court erred in requiring the State to rebut the parental presumption; (2) whether the juvenile court's factual findings underlying the determination that A.M. had successfully rebutted the parental presumption are clearly erroneous; and (3) whether the juvenile court violated L.A.W.'s due process rights in determining custody without taking evidence specifically addressing each party's fitness as it relates to the children's best interests.

## ANALYSIS

### I. Existence of Parental Presumption

It is without dispute that the Utah Constitution and the United States Constitution "recognize[ ] and protect[ ] the inherent and retained right of a parent to maintain parental ties to his or her child...." *In re J.P.,* 648 P.2d 1364, 1377 (Utah 1982). Thus, in termination cases, we have held that "it is unconstitutional to terminate a parent's rights based upon a finding of the best interests of the child without first finding that the parent is below some minimum threshold of fitness." *State ex rel. G.D. v. L.D.,* 894 P.2d 1278, 1284 (Utah Ct.App.1995) (citation omitted).

We note that the "[l]oss of custody is less drastic than the permanent termination of parental rights" and thus "a parent may be deprived of custody on a less compelling showing than is required for termination of all parental rights." *Hutchison,* 649 P.2d at 40. However, even in custody cases, a parent retains his or her constitutional right to maintain ties with his or her child, *see In re J.P.,* 648 P.2d at 1377, as well as " 'the natural right and authority ... to the child's custody,' " *Hutchison,* 649 P.2d at 40 (quoting *In re Jennings,* 20 Utah 2d 50, 52, 432 P.2d 879, 880 (1967)). Thus, although usually worded in relation to a child's best interests, we have long recognized "a presumption in favor of the natural parent" when that parent is competing with a nonparent for custody of the parent's children. *Id.; see also State ex rel. H.R.V.,* 906 P.2d 913, 916 (Utah Ct.App. 1995) (noting parental presumption "protect[s] both the rights of natural parents and the best interests of the children"). In fact, we have consistently held that it is only when a parent has lost the parental presumption that a court may consider the contesting parties as being on equal footing regarding what may be in the child's best interests. *See Cooper v. DeLand,* 652 P.2d 907, 908–09 (Utah 1982) (per curiam) (stating "Only after the parental presumption has been rebutted, will the parties compete on equal footing, and custody shall then be granted to [the] party who will most adequately protect and promote the best interests of the child.").

Thus, the presumption in a custody case serves to protect a parent's rights in his or her children in the same way that requiring proof of unfitness in a termination of parental rights case does. Without the presumption, a parent would be required to engage in custody battles with nonparents based solely on the children's best interests. A parent's constitutional and natural rights in his or her children are too important to allow such a result. *Cf. In re J.P.,* 648 P.2d at 1376 (noting "the standard of 'best interest' of the child [alone] provides an open invitation to trample on individual rights through trendy redefinitions and administrative or judicial abuse"). Thus, although our courts have established that a parent may lose the presumption under certain circumstances, those circumstances should be narrowly defined to ensure that a parent's rights remain protected.

As stated in *Hutchison,* a natural parent may lose the parental presumption if the nonparent rebuts it by establishing

that a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption: that no strong mutual bond exists, that the parent has not demonstrated a willingness to sacrifice his or her own interest and welfare for the child's, and that the parent lacks the sympathy for and understanding of the child that is characteristic of parents generally.

*Hutchison,* 649 P.2d at 41.

In addition, a natural parent may lose the right to assert the parental presumption altogether if that parent has previously lost custody of the child. *See H.R.V.,* 906 P.2d at 917 (holding presumption does not apply "once the natural parent has lost custody of his or her child" and noting "all the Utah cases previously requiring a trial court to consider the parental presumption have involved situations where a natural parent is, for the first time, in danger of losing legal custody to a nonparent"). *But see Duncan v. Howard,* 918 P.2d 888, 892 (Utah Ct.App. 1996) (applying presumption when father never had custody of child, noting "he has never lost his right to assert the presumption due to an adjudication of any lack of fitness as a parent"); *State ex rel. J.M.,* 940 P.2d 527, 530 n. 3 (Utah Ct.App.1997) (suggesting *Hutchison* language that " 'presumption does not apply to parent who would be subject to termination of all parental rights due to unfitness, . . . since such a parent is *a fortiori* not entitled to custody,' " is dicta, that use of that language "to support a hypothetical parental-rights-termination analysis" is "confusing and unwarranted" in a custody case, and that *Hutchison* language was "not intended as an alternative way to reach the best-interests inquiry in these types of cases."). It is this type of forfeiture that must be narrowly defined to ensure that a parent's rights in his or her children are not easily ignored. We further believe that such a definition would be consistent with the result reached in *H.R.V.*

Relying on *H.R.V.,* the dissent concludes that the parental presumption does not apply in this case because, at the time of the custody hearing, L.A.W. did not have actual physical custody of her children. Thus, the dissent states, "the juvenile court incorrectly considered the parental presumption before reaching the issue of the children's best interests."

At the custody trial, none of the parties challenged the applicability of the parental presumption to L.A.W. and no arguments were made on the subject. The juvenile court was not asked to and did not determine whether the reasoning in *H.R.V.* applied to this case.[2] In light of this fact, and because A.M., in any event, rebutted the presumption, we believe the dissent's reliance on *H.R.V.* is unnecessary. Furthermore, we believe the dissent misinterprets *H.R.V.'s* holding, and improperly expands its holding beyond constitutional limits.

In *H.R.V.,* after an evidentiary hearing, the juvenile court entered an order in June 1990 concluding that the father's children were "neglected" as defined in the Utah Code and "temporarily depriv[ing] the parents of custody and guardianship of the children." *Id.* Although the court initially stayed its order, it removed the stay in November 1990, after determining that the father had not complied with conditions set forth in its prior order. *See id.* In May 1993, the father petitioned the court for restoration of custody. *See id.* at 915. Before addressing whether the parental presumption applied in that case, this court first noted that "[O]nce a parent has been deprived of his or her child's custody, section 78–3a–47 [of the Utah Code] applies to any subsequent petition for restoration of custody. . . . This section applies if the *final* order of the juvenile court provides for either the child's 'permanent' or 'temporary' placement." *Id.* (Emphasis added.) Thus, in holding that section 78–3a–47 applied in that case, the court necessarily concluded that the order depriving the father of custody was a *final* order from the juvenile court.[3] This

---

**2.** *H.R.V.* was not issued until after the trial was completed and is not mentioned in any of the briefs filed in this appeal.

**3.** Indeed, inherent in the father's need to petition for restoration of custody was the fact that he had lost custody of the children in a prior, *final*

proceeding. *See H.R.V.,* 906 P.2d at 915 (emphasis added); *see also State ex rel. Tom,* 556 P.2d 213, 215 (Utah 1976) (holding opposing party need not file petition to modify custody to challenge petitioners' petition for custody when petitioners were merely granted temporary custody

conclusion is central to the court's subsequent determination that the father had lost the right to assert the parental presumption; that is, the holding in *H.R.V.* that the father had lost the right to assert the presumption because he had been previously deprived of that child's custody, must be interpreted in light of the finality of the order previously depriving the father of custody.

In *State ex rel. T.H. v. R.H.*, 860 P.2d 370 (Utah Ct.App.1993), this court discussed the difference between a temporary custody order and a final order, noting that "temporary can refer to an interim custody order pending a final factual determination [on] the . . . petition" at issue or "to the temporary placement of a child under a final order after a hearing on the merits of [that] petition. . . ." *Id.* at 374. Therefore, only the second custody order, even though it establishes only temporary placement, is final.

Under *H.R.V.*, it is only in the second case that the parent loses the ability to assert the parental presumption, because it is only then that the parent has been subject to a prior adjudication of his or her parenting ability and the juvenile court has found that ability seriously lacking. *See Eaves v. Traffanstedt*, 678 So.2d 179, 181 (Ala.Civ.App.1996) (holding parent did not lose right to assert parental presumption when trial court entered ex parte order awarding temporary custody of children to grandparents pending custody modification proceeding where ex parte order was not final order). Thus, the presumption is lost because it was already rebutted in the prior proceeding.[4]

■ However, when custody is temporarily granted to a nonparent over a parent pending the outcome of a proceeding in which the parent is, for the first time, in danger of losing legal custody to a nonparent, that temporary placement cannot serve to overcome the presumption because the court has not yet made a "final factual determination" on the merits of the petition at issue. *Cf. State ex rel. T.H.*, 860 P.2d at 374. To hold otherwise would mean that the parental presumption could be lost without a court ever ruling on whether the parent's parenting skills are deficient. Because of the myriad of reasons a juvenile court may give temporary custody to a nonparent, not all of which even begin to suggest a parent's ineptitude, such a result would routinely expose a parent to the loss of custody of his or her children based solely on the children's best interests, a standard recognized to be vulnerable to abuse. *See In re J.P.*, 648 P.2d at 1376. Certainly, this result is unacceptable in light of the parent's constitutional and natural rights to custody of his or her children.

■ Thus, in considering whether *H.R.V.* applies in this case to deprive L.A.W. of the parental presumption, we must first determine the nature of the juvenile court's prior orders granting A.M. temporary custody and the circumstances under which those orders were entered. Only if those orders unambiguously disclose a final decision of the court, rendered after making final factual determinations about L.A.W.'s parenting ability, may we conclude that the parental presumption is no longer available to L.A.W.

In this case, there is no question that the juvenile court's pretrial orders granting A.M. temporary custody of L.A.W.'s children were temporary orders pending the outcome of the various custody petitions before the court. Although the dissent is correct in noting that L.A.W. admitted to certain allegations of neglect at the February 6, 1994, hearing, the order resulting from that hearing merely

---

of child pending outcome of their petition and such grant of custody was not *"final* determination and decree of custody" (emphasis added)).

4. An additional distinction exists between the facts of *H.R.V.* and this case. In *H.R.V.*, the final order was based on findings, among others, that the father had failed to support the child, had engaged in criminal conduct affecting his paren-

tal abilities and otherwise shown lack of parental responsibility and characteristics. *See H.R.V.*, 906 P.2d at 914. In this case, the juvenile court's findings at the February 9, 1994, adjudication hearing were to the effect that the children were neglected, but did not specifically state that L.A.W. was the cause of the neglect or that she lacked adequate parenting abilities.

stated that "the previous order of custody and guardianship with the Division of Family Service is continued."[5] A prior order, filed January 31, 1994, and stemming from a pretrial hearing held November 22, 1993, states that "[t]he parents are temporarily deprived of custody and guardianship of the[ir] [children] and custody and guardianship ... is vested in the Division of Family Services" and that "the children will remain in the home of their grandmother, [A.M.] pending the trial hearing." Furthermore, at the February hearing, a disposition hearing was set for March 8, 1994, at which the court again ordered that "[t]he previous order of temporary custody and guardianship ... with the Division of Family Service is continued" and that A.M. would "continue to provide for the needs of the children." At that time, an "In-Court Review" was set for June 28, 1994. At this hearing, the court consolidated the State's case with the petition for custody filed by A.M. and the petitions filed by the children's respective parents; ordered that "[t]emporary custody and guardianship of [the children] continue with the Division of Family Services"; ordered that the children would be placed with A.M.; and set the matters for trial. At pretrial on October 11, 1994, the court ordered again that "[t]he previous order of custody and guardianship with the Division of Family Services is continued." Finally, at the close of trial on January 17, the court ordered that "[t]emporary custody and guardianship is continued with [A.M.]" but that the hearing would continue the following week.

As the above recitation shows, at no time did the juvenile court issue a final order depriving L.A.W. of custody of her two children. Indeed, each order contemplated further action in the case. Furthermore, at no time prior to trial did the court issue any formal findings of fact concerning L.A.W.'s

relationship with her children in support of a conclusion that L.A.W. should be deprived of custody. Therefore, the juvenile court correctly directed the parties to present evidence and arguments as to whether L.A.W.'s parental presumption should be rebutted.

## II. Findings of Fact

■ When a nonparent challenges a natural parent for custody of a child, we presume it is in the child's best interest to be placed with his or her natural parent. *See J.M.*, 940 P.2d at 530.

> [This presumption] is rooted in the common experience of mankind, which teaches that parent and child normally share a strong attachment or bond for each other, that a natural parent will normally sacrifice personal interest and welfare for the child's benefit, and that a natural parent is normally more sympathetic and understanding and better able to win the confidence and love of the child than anyone else.

*Id.* (quoting *Kishpaugh v. Kishpaugh*, 745 P.2d 1248, 1250 (Utah 1987) (quoting *Hutchison*, 649 P.2d at 40)). The parental presumption thus "recognizes the benefits of having loving and able parents raise their children despite the willingness of nonparents who may possess superior care taking skills." *H.R.V.*, 906 P.2d at 917.

■ However, the presumption is not unassailable. A nonparent may rebut the presumption if the nonparent can show that " 'a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption.' " *Id.* (quoting *Hutchison*, 649 P.2d at 41). The three characteristics are: (1) strong bonding with the child, (2) a tendency to sacrifice personal interest and welfare for the child's

---

5. In *State ex rel. E.M.*, 922 P.2d 1282, 1284 (Utah Ct.App.1996) (per curiam), this court held that an adjudication order in the context of abuse, neglect, or dependency petitions is "final and appealable" under section 78–3a–51 of the Utah Code. However, in reaching that conclusion, the court relied on *In re J.J.T.*, 877 P.2d 161, 164 n. 3 (Utah Ct.App.1994) (noting that "[a]lthough the juvenile court retains continuing jurisdiction of a child whose custody was adjudicated in a neglect

proceeding, the findings and order entered pursuant to the neglect petition are final and appealable" (citations omitted)). The *E.M.* court was careful to note that the juvenile court in that case "entered extensive findings of fact and ... conclusions of law." *State ex rel. E.M.*, 922 P.2d at 1283. It may well be that "final" has different meanings in the context of the right to appeal versus abrogation of the parental presumption.

benefit, and (3) a tendency to be more sympathetic and understanding of the child than anyone else. *See Hutchison,* 649 P.2d at 41. "Only after the parental presumption has been rebutted will the parties compete on equal footing, and custody shall then be granted to the party who will most adequately protect and promote the best interests of the child." *Cooper,* 652 P.2d at 908–09.

■ L.A.W. challenges several of the juvenile court's findings of fact and argues that these errors led the court to erroneously conclude that A.M. successfully rebutted the parental presumption. L.A.W. challenges "in general the findings of fact establishing the elements required for rebuttal of the parental presumption, and in particular findings of fact 2, 3, 7, 9, 10, 11, 12, 13, 14, 15, 16 and 17." However, because L.A.W. failed to marshal the evidence concerning her challenge "in general," *see J.M.,* 940 P.2d at 531 (holding that appellant challenging factual findings " 'must (1) marshal all of the evidence that supports the finding, and (2) demonstrate that, despite the evidence, the finding is so lacking in support as to be "against the clear weight of the evidence" and thus, clearly erroneous' " (citation omitted)), we address only her challenges to the specific factual findings listed in her brief.

> [U]nder the well-established standard of review for child custody proceedings, we do not set aside the trial court's factual findings unless clearly erroneous.... A finding is clearly erroneous if it is against the great weight of the evidence or if we are otherwise definitely and firmly convinced that a mistake has been made.

*Hardy v. Hardy,* 776 P.2d 917, 922 (Utah Ct.App.1989) (citations omitted). A finding is not clearly erroneous, however, merely because the juvenile court accepted one party's evidence over another's. *See J.M.,* 940 P.2d at 531 (stating " '[i]t is the role of the

juvenile court, not this court, to assess the weight and credibility of expert witnesses and to choose among their testimonies' ") (quoting *State ex rel. G.V.,* 916 P.2d 918, 920 (Utah Ct.App.1996)).

■ L.A.W. challenges the juvenile court's findings of fact 2 and 9 because both refer to the fact that L.A.W. was at one point alleged to have sexually abused M.W.[6] L.A.W. claims both findings are erroneous because they suggest that the juvenile court accepted as true the allegations against L.A.W. when the allegations were never in fact proven. A plain reading of the findings, however, does not support this contention. Neither finding states that L.A.W. did in fact sexually abuse M.W. The reference in each finding to the allegations against L.A.W. serve merely to explain why certain actions were taken in connection with the children. Thus, neither finding is clearly erroneous.

L.A.W. also objects to finding of fact 3 because the juvenile court referred to L.A.W.'s surgery as a "sex change operation" rather than "gender-corrective surgery."[7] However, a review of the trial transcript shows that L.A.W.'s counsel never objected to the description of L.A.W.'s surgery as a "sex change operation" and, in fact, used that phrase often himself. Thus, finding 3 is not clearly erroneous.

We also reject L.A.W.'s contention that finding 3 is clearly erroneous because the juvenile court failed to explain how the finding is relevant to either rebuttal of the parental presumption or the custody decision. The finding clearly serves as a foundation for other findings concerning L.A.W.'s attempts to prepare the children for her surgery and about the reaction of her children to the surgery, both of which address L.A.W.'s ability to bond with the children, her willingness to sacrifice her interests for their benefit,

---

**6.** Finding of Fact 2 states: "The children have been in the custody of [DFS] since September of 1993 due to allegations of sexual abuse against the father, [L.W]." Finding of Fact 9 states:

> The minor children were examined by Dr. Marty Palmer of the Primary Children's Medical Center ... on September 10, 1993 and sexual abuse was substantiated, with [S.W.] showing a marked deterioration from the time

of a previous exam ... in March 1993 which exam was performed based on earlier allegations of sexual abuse against [L.A.W.].

**7.** Finding of Fact 3 states: "The natural father of the above named children ... underwent a sex change operation in August of 1993 and is now named [L.A.W.]."

and her ability to understand and sympathize with their needs.

Next, L.A.W. asserts that finding of fact 7 is unsupported by the evidence.[8] However, this finding is supported by an undated DFS report by Shelley Phillips, which states, "In September of 1993, while staying with her grandmother, M.W. stated that her father had sexually abused her," and by a November 17, 1993, report prepared by Dr. Kevin Gully excerpting an August 30, 1993, written statement by A.M. about M.W.'s description of L.A.W.'s sexual abuse of her. Because L.A.W. did not object to or explore the bases for these specific statements when questioning the reports' authors at trial, the juvenile court was free to consider that evidence in preparing its findings.

L.A.W. also challenges a portion of finding of fact 9 which states that a March 1993 examination of the children by Dr. Palmer "was performed based on earlier allegations of sexual abuse against [L.A.W.]." This finding, however, is supported by an "Affidavit in Support of Ex Parte Temporary Restraining Order" filed by L.A.W.'s counsel on August 27, 1993, which states: "In February 1993 allegations of sexual abuse were made against the parents. After an investigation by the Child Protection Team at Primary Children's Medical Center and the Division of Family Services, the charges were found to be unfounded." This finding, then, is not clearly erroneous.

L.A.W. next challenges findings of fact 10 and 11 because they "blindly" quote or re-

cite certain witnesses' testimony.[9] However, as previously observed, this court defers to the juvenile court's assessment of evidence and witness credibility. See State ex rel. R.A.F., 863 P.2d 1331, 1333 (Utah Ct.App. 1993) (stating "trial court is in a better position to observe factors bearing on credibility"). We also reject L.A.W.'s contention that findings 10 and 11 are not germane to rebuttal of the parental presumption. Both findings obviously support the juvenile court's later conclusion that L.A.W. lacked the three characteristics giving rise to the parental presumption.

L.A.W. also disputes the part of finding of fact 12 that states, "the parents admitted that the minor children had been neglected as defined in [section] 78–3a–2 U.C.A." However, the record shows that at the February 9, 1994, juvenile court hearing on the State's neglect petition, L.A.W. admitted that "[M.W.] has been sexually abused and [S.W.] may have been sexually abused, by a person or persons whose identity is unknown." Also, as L.A.W. notes in her reply brief, she had admitted that "[t]he children are in need of treatment and the parents are unable to provide that treatment," upon the condition that she be allowed to explain her admission. Thus, finding 12, although not containing great detail, is also not clearly erroneous.

L.A.W. next challenges finding of fact 13,[10] claiming the treatment plan referred to in the finding "does not contain a reference to reunification with [L.A.W.]," and thus re-

---

8. Finding of Fact 7 states, in relevant part: "While staying with her grandmother, [M.W.] stated that her father had sexually abused her."

9. Finding of Fact 10 states:
   In August of 1993 [L.A.W.] had a sex change operation. . . . Prior to said operation the children did not receive any counseling nor according to the testimony of Dr. Jill Sanders, "the children were not adequately prepared for [L.A.W.'s] decision to alter her sex . . . [. T]he impact of the sex change on [M.W.] was weird, confusing, and strange [and] the confusion created for the children could have been offset by better preparation or a better choice of timing."
   Finding of Fact 11 states: "Neighbors testified that the children were continually left unattended and unsupervised particularly by [L.A.W.] at the early ages of life and care. . . ."

10. Finding of Fact 13 states:
    In early 1994, Dr. Jill Sanders performed Capacity to Parent Evaluations on the natural parents and [A.M.], the maternal grandmother. The specific reason for the referral to Dr. Sanders was "to provide [DFS] additional information for use in formulating treatment plans and/or making placement recommendations to the court." . . . Dr. Sanders further testified at trial:
    My psychological assessment of these parties suggested that they had the intellectual capacity to comply with a treatment plan well within a four month period . . . [.] There were no factors that would inhibit [L.A.W.'s] ability to be compliant with the [DFS] treatment plan. Given their resources, they could probably do it in a two month time.

flects the bias which L.A.W. argues DFS has against her. However, both treatment plans in the record identify L.A.W. as one of the children's parents and indicate that the permanency goal for the children was for them to "return home." Furthermore, both plans address objectives for L.A.W. to meet in order to regain custody of her children. Thus, we uphold the juvenile court's finding 13.[11]

Next, L.A.W. argues that the juvenile court, in findings of fact 15 [12] and 16,[13] erred in failing to recognize the extent to which L.A.W. had complied with the treatment plans, even where W.M. had not. However, as the findings suggest, there was sufficient evidence in the record to support the juvenile court's finding that L.A.W. did not substantially comply with the treatment plans' requirement that L.A.W. focus on issues confronting her children. Numerous witnesses testified that L.A.W. spent an inordinate amount of time during therapy sessions absorbed in her own issues. The fact that L.A.W. was able, at times, to focus on her children's needs does not undermine the court's finding that those instances were insufficient compliance with the treatment plans. Thus, findings of fact 15 and 16 are not clearly erroneous.

Finally, L.A.W. argues that finding of fact 17 [14] is clearly erroneous because the record contains no evidence concerning the bond which existed between her and her children prior to the children's placement with A.M. However, numerous witnesses testified that, during the year or so immediately prior to A.M. gaining custody of the children, L.A.W. did at times leave M.W. alone at home; L.A.W. did at times leave both children home alone, expecting M.W. to take care of S.W.; L.A.W. was at times reckless when walking

11. L.A.W. also challenges Finding of Fact 14. However, finding 14 addresses only W.M.'s failure to secure housing separate from L.A.W. Because the finding does not address L.A.W., an error in the finding, if any, would be harmless. Thus, we decline to address L.A.W.'s challenge to this finding on the merits.

12. Finding of Fact 15 states, in relevant part:

[DFS] was not the reason for non-compliance with treatment plans as asserted by the defense. Rather, the evidence shows that the behavior patterns of both of these parents suggest that they are both self-absorbed in their own pursuits and problems. They, not DFS[,] owned [sic] the responsibility to determine and seek individual counseling and therapy to address the many issues presented when their children engaged in sexualized behavior, displaced emotional detachment, expressed fear and refused contact with a parent as testified to by Cacie Cheuvront, the children's therapist, Dr. Jill Sanders, and DFS workers. The suggestion that a DFS case worker is to blame for [L.A.W.'s] non-compliance with Court ordered treatment plans is not supported by ... the evidence.

13. Finding of Fact 16 states, in relevant part:

With respect to [L.A.W.], the evidence showed that [L.A.W.] participated with her children in therapy ... with Cacie Cheuvront. In her testimony, Ms. Cheuvront indicated that ... she had trouble getting [L.A.W.] to focus on the children's issues and that [L.A.W.] has often had difficulty focusing on the children and focusing on their issues....

Ms. Cheuvront testified ... that "there was then, and there still appears to be, a certain amount of ambivalence on the part of both children in regards to their relationship with their natural father." Had a strong mutual bond previously existed between the children and their parents, that bond of attachment would have continued even with limited contact. Dr. Sanders testified that, "I believe that neither of these children are attached to [L.A.W.] or [S.W.] as their primary caretaker. I do not believe there is mutual attachment between [L.A.W.] and the children...." Moreover, [M.W.] continued to express fear of [L.A.W.] many months into [M.W.'s] therapy and was reluctant to have physical contact with [L.A.W.] and for the "benefit of the child, only limited contact was permitted."

14. Finding of Fact 17 states, in relevant part:

Other evidence presented suggests that the two children did not have a strong attachment to their parents ... long before the involvement by [DFS] and the removal of the children from the home....

....

The cumulative evidence presented through the testimony of neighbors, therapists, evaluators, relatives, and admissions of W.M. suggests that long before [DFS] became involved with the children, the parents were not providing the level of comfort, care, and safety to the children which a strong bond or attachment would require. After a relatively short separation from the parents, the two children were more comfortable in their sense of safety attachment to their grandmother, [A.M.], as confirmed in testimony from both Dr. Sanders and the children's therapist, Cacie Cheuvront.

with the children on busy streets; and L.A.W. often left the children at a neighbor's house for long periods of time, even when L.A.W. remained at home. In addition, several witnesses testified that M.W. exhibited fear towards L.A.W. and that M.W. talked about a "hiding tree" even before A.M. took custody of the children. Finally, at least one witness testified that the strength of a bond between two people would be reflected in their ability to maintain a closeness after they have been separated. In this case, the children exhibited relatively little desire to return to L.A.W., even after just a short time with their grandmother. In light of this evidence, the juvenile court's finding that the children did not share a strong bond with L.A.W. even prior to A.M. gaining custody is not clearly erroneous.

▉ Because none of the findings challenged by L.A.W. are clearly erroneous, and because the majority of these facts address the three *Hutchison* factors that give rise to the parental presumption and support the conclusion that A.M. succeeded in rebutting that presumption, we affirm the juvenile court's findings on those issues.

## III. Due Process

L.A.W. also argues that the juvenile court violated her due process rights by making a custody determination without receiving evidence concerning the children's best interests, having limited the evidence at trial to the issue of whether A.M. had rebutted the parental presumption in favor of the natural parents. L.A.W. argues that by its repeated emphasis over the course of the five-day trial, that the court's focus was on rebuttal of the parental presumption, the court deprived L.A.W. of the opportunity to present evidence addressing whether placement with A.M. was in the children's best interests.[15] L.A.W. contends the trial court would not allow her to present evidence relating to ultimate custody of the children and that she had evidence to present on that issue, specifically relating to A.M.'s fitness.

"It is well established that '[t]imely and adequate notice and an opportunity to be heard in a meaningful way are the very heart of procedural fairness.'" *W. & G. Co. v. Redevelopment Agency*, 802 P.2d 755, 761 (Utah Ct.App.1990) (quoting *Nelson v. Jacobsen*, 669 P.2d 1207, 1211 (Utah 1983)); *see also In re Worthen*, 926 P.2d 853, 876 (Utah 1996) (holding that "[a]t a minimum," procedural fairness requires timely and adequate notice and opportunity to be heard). "Thus, to satisfy due process, a hearing '"must be prefaced by timely notice which *adequately informs the parties of the specific issues they must prepare to meet."*'" *Id.* at 877 (quoting *Nelson*, 669 P.2d at 1213 (citation omitted)) (emphasis in original). "[W]here notice is ambiguous or inadequate to inform a party of the nature of the proceedings against him [or her] or not given sufficiently in advance of the proceeding to permit preparation, a party is deprived of due process." *State v. Rawlings*, 893 P.2d 1063, 1069 (Utah Ct.App. 1995) (internal quotation marks & citations omitted); *see also Worthen*, 926 P.2d at 877; *W. & G. Co.*, 802 P.2d at 762.

In this case, the record clearly shows that all parties to the custody proceedings, as well as the juvenile court, understood that the custody determination would involve two issues: (1) whether A.M. could succeed in rebutting the parental presumption in favor of the natural parents, and (2) if so, whether the children's best interests would be served by placement with A.M. or with one of the children's natural parents. The record also clearly shows that, over the course of the five day trial, the juvenile court repeatedly directed the parties to limit presentation of their cases to evidence relevant to the rebuttal of the parental presumption. As late as the last day of trial, the State objected to certain testimony because it "doesn't appear to have any relevance to the issues of the *Hutchison* case, but more relates to the custody and ability of the party to take care of her children." The trial court allowed this testimony, but only after L.A.W.'s counsel

---

15. The State and A.M. claim L.A.W. did not preserve this issue before the juvenile court. Indeed, it is unclear how L.A.W. could have preserved this issue below when her whole argument is that she lacked notice that the juvenile court would be deciding the children's best interests without additional hearings.

informed the court that the evidence was relevant to the parent's "willingness or unwillingness to sacrifice" for the children. Even at the close of trial, when the court requested that the parties prepare briefs summarizing the evidence, the court's instructions were ambiguous, at best, as to whether it expected the briefs to address the children's best interests:

> Okay. Just some thoughts, okay, and I know we're going to argue, but certainly there's been a lot of evidence and the burden's been on [A.M.] to—to show that the parents ... are unfit parents; but I—I think I need your briefs to also address a lot of other issues that I think I need to use in determining whether the *Hutchison* standards have been met. . . .
>
> . . . .
>
> Those are issues that I'm wrestling with and I know that there's those three—the three prongs of the *Hutchison* case, but I think all of these issues and these comments that I've made are relevant to me deciding those three prongs of the *Hutchison* case.
>
> . . . .
>
> I mean the *Hutchison* standards are compelling, but all these other things come into play when making those determinations in those three areas.

Although L.A.W. undoubtedly understood when the trial began that the children's best interests would be one issue before the juvenile court in determining custody of her children, the juvenile court repeatedly referred to and emphasized the *Hutchison* factors. In addition, the court sustained several objections when the parties argued that certain evidence went to custody rather than to the parental presumption. Consequently, L.A.W. was deprived of adequate notice that, after the close of evidence on the fifth trial date, the juvenile court would decide both whether the parental presumption had been rebutted and whether the children's best inter-

ests would be served by placement with A.M. or with one of the children's natural parents. Furthermore, this lack of notice deprived L.A.W. of the opportunity to present evidence and argument on the "best interests" issue prior to the juvenile court's decision. *See Rawlings,* 893 P.2d at 1069 (" '[A]ll parties are entitled to notice that a particular issue is being considered by a court and to an opportunity to present evidence and argument on that issue before decision.' " (citation omitted)). Therefore, L.A.W.'s right to due process was violated.[16]

## CONCLUSION

The juvenile court properly considered evidence of whether the parental presumption was rebutted because no prior final order had deprived L.A.W. of custody of her two children. Because the evidence supports the juvenile court's findings of fact and its conclusion that A.M. successfully rebutted the parental presumption in favor of natural parents, we uphold the juvenile court's conclusion on that issue. However, because the juvenile court's repeated instruction to the parties to limit the evidence to that addressing the parental presumption deprived L.A.W. of her due process right to present evidence concerning the children's best interests, we remand this case to the juvenile court for additional evidentiary hearings on that issue. In addition, based on the concession of A.M., we reverse the juvenile court's order awarding attorney fees.[17]

BILLINGS, J., concurs.

JACKSON, Judge (concurring in the result in part and dissenting in part):

Regarding L.W.'s parental presumption, contrary to the majority, I would hold that she had no presumption to rebut. The effect of my disagreement with the majority here is to concur in the result, because either way the custody inquiry moves to considering the

16. Because of our resolution of the due process claim, we do not address L.A.W.'s argument that the juvenile court was required to bifurcate the hearings on the parental presumption and the best interests of the children.

17. L.A.W. raises other issues on appeal which we do not address because we find them to be without merit. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989).

children's best interests. Further, because I would hold that L.W. did not preserve her due process claim, I dissent as to that issue.

## ANALYSIS

### I. Parental Presumption

L.W. first contends certain of the juvenile court's factual findings are clearly erroneous, asserting these errors ultimately led the juvenile court to erroneously determine that A.M. successfully rebutted the parental presumption in favor of L.W. The State argues—and the majority concurs—that the factual findings should be upheld. However, in oral argument before us, the State alternatively argued that the juvenile court should not have considered the applicability of the parental presumption to L.W. because she did not have custody of her children based on the neglect adjudication. I agree with the State's alternative argument. *See Gardner v. Madsen*, 949 P.2d 785, 789 n. 2 (Utah Ct.App.1997) (stating "[t]his court may affirm the trial court on any proper ground, even though not relied upon below").

As the majority stated, the parental presumption may be rebutted by evidence showing " 'a particular parent at a particular time generally lacks all three of the characteristics that give rise to the presumption.' " *State ex rel. H.R.V.*, 906 P.2d 913, 917 (Utah Ct.App. 1995) (quoting *Hutchison v. Hutchison*, 649 P.2d 38, 41 (Utah 1982)). However, I believe the *H.R.V.* case stands for the proposition that the presumption is also forfeited "once the natural parent has lost custody of his or her child" as L.W. did here. *Id.* I believe that no meaningful distinction exists between *H.R.V.* and this case.

In *H.R.V.*, the children were placed in the temporary custody of the Division of Family Services, prompting their aunt to petition for custody. *See id.* at 914. After a contested evidentiary hearing, the juvenile court adjudicated the children neglected and awarded temporary custody to their aunt. *See id.* The father petitioned the court for the re-turn of his children and fought the aunt for permanent custody. *See id.* at 915. The juvenile court did not consider the father's parental presumption, but awarded permanent custody to the aunt based on an analysis of the children's best interests. *See id.*

The father appealed the juvenile court's ruling, arguing that the court should have accorded him the parental presumption and not made its decision based on the children's best interests. *See id.* This court ruled that because the father had lost temporary custody of his children due to the neglect adjudication, he had no right to assert his parental presumption later:

> The presumption recognizes the benefits of having loving and able parents raise their children despite the willingness of nonparents who may possess superior caretaking skills. However, the parental presumption is based on the characteristics pertaining to a *healthy* parent-child relationship. When custody has been transferred from a natural parent to a nonparent, it is because the parent has been shown to lack those parental characteristics which give rise to the presumption.

*Id.* at 917.

The significant facts of our case are on point with those of *H.R.V.* and, in my estimation, are controlled by the law and policy considerations discussed in that case. Similar to *H.R.V.*, the children here were placed in the temporary custody of the Division of Family Services, prompting their grandmother to petition for custody. *See id.* at 914. In both cases, the parents were temporarily deprived of custody based on a neglect adjudication.[1] *See id.* In both cases, the contestants for custody each filed petitions for permanent custody, which were ultimately decided against the parents. *See id.* at 915.

Consequently, under the law discussed in *H.R.V.*, L.W. had no right to assert the parental presumption before the juvenile

---

1. Thus, this is not a case, as the majority contends, in which L.W. was " 'for the first time, in danger of losing legal custody to a nonparent.' " *See supra* majority opinion p. 289. Just as in *H.R.V.*, by the time L.W. asserted her parental presumption in the permanent custody proceedings, she had already lost temporary legal custody of her children to a nonparent. *See State ex rel. H.R.V.*, 906 P.2d 913, 916–17 (Utah Ct.App. 1995).

court. Based on her admissions to the allegations resulting in the neglect adjudication against her, L.W. was shown to have the unhealthy parent-child relationship discussed in *H.R.V. See id.* at 917. After all, as the *H.R.V.* court explained, "[w]hen custody has been transferred from a natural parent to a nonparent, it is because the parent has been shown to lack those parental characteristics which give rise to the presumption." *Id.* Under the law explained in *H.R.V.*, I believe that here when custody was left with the children's grandmother following the neglect adjudication, it was because L.W. was likewise "shown to lack those parental characteristics which give rise to the presumption." *Id.* By neglecting her children—as she did by her own admission—L.W. failed to show them the sympathy, understanding, and self-sacrificing nature typical of parents. *See id.* (citing *Hutchison*, 649 P.2d at 40). She thus lost her right to assert the presumption.

In response to the majority's reading of *H.R.V.*'s discussion of the law, I note up front that I firmly agree with the majority that parents' constitutional and natural rights to their children are of paramount importance and require scrupulous societal protection. However, I believe that placing this case along with *H.R.V.* in the set of fact situations in which a parent loses his or her parental presumption does not significantly or unconstitutionally broaden beyond the majority's parameters the category of circumstances in which parents may lose their presumptions. Certainly, if the facts of *H.R.V.* fall within constitutional limits in denying the presumption, so do the facts of this case. *See id.* The majority tries to distinguish *H.R.V.* from this case in three ways, all of which are unpersuasive to me.

First, the majority distinguishes the types of final temporary custody orders in these cases. I believe a skirmish over technical definitions of "final order" should not govern this matter; rather, the policy considerations regarding the unhealthiness of the parent-child relationship should. The *H.R.V.* opinion certainly did not place any importance on the type of final temporary custody order in explaining the policy considerations controlling these types of cases. *See id.* The ma-

jority even concedes that the order in this case is "'final and appealable' under section 78–3a–51 of the Utah Code." *See supra* majority opinion note 5. The majority further muses that "final" may have "different meanings in the contexts of right to appeal versus abrogation of the parental presumption," but offers no rationale why the two may be different. *See id.* The vital concern in *H.R.V.*—as it should be in this case—is that, by neglecting his children, the parent was deemed per se to have allowed his relationship with his children to deteriorate, showing a general lack of the three *Hutchison* factors giving rise to the presumption. *See H.R.V.*, 906 P.2d at 917 (citing *Hutchison*, 649 P.2d at 40).

Second, the majority distinguishes this case from *H.R.V.* based on the supposedly more egregious nature of the neglect in *H.R.V. See supra* majority opinion note 4. Even so, the *H.R.V.* case does not discuss particular levels of underlying neglectful conduct necessary to trigger its holding. What *H.R.V.* does discuss is the one critical level of neglect to which its holding applies: When neglectful conduct results in a neglect adjudication that deprives a parent of temporary custody, a parent may not assert his or her parental presumption in further custody proceedings. *See H.R.V.*, 906 P.2d at 916–18. This is the same level of neglect that occurred in the case at bar.

Finally, the majority appears to further distinguish *H.R.V.* from this case because *H.R.V.* involved an evidentiary hearing leading to a finding of neglect, while this case involved a stipulation to allegations of neglect. Whether by trial or stipulation, the parents in these cases are equally condemned of neglecting their children. In each case, the evidence, whether presented in an adversarial posture or undisputed, showed parental neglect leading to an adjudication of neglect. What L.W. was essentially saying by stipulating to neglect is that she recognized that the strong evidence would result in a finding of neglect; by stipulating to it, similar to a plea bargain, she could control and limit the characterization of the egregiousness of her conduct. I see no good reason to reward L.W. with a parental pre-

sumption simply because she chose not to face allegations of more troubling behavior than that to which she stipulated.

Simply put, I believe *H.R.V.* explains that, when a parent has lost temporary custody of his or her child to a nonparent based on an adjudication of neglect, he or she loses the right to assert the parental presumption. *See id.* at 914–18. Because the *pivotal* facts of this case are on point with those of *H.R.V.*, I believe we must follow *H.R.V.*'s explanation of the law. *See State v. Thurman,* 846 P.2d 1256, 1269 (Utah 1993) (requiring horizontal stare decisis between panels of this court).

Accordingly, I would hold that the juvenile court incorrectly considered the parental presumption before reaching the issue of the children's best interests. *See C & Y Corp. v. General Biometrics, Inc.,* 896 P.2d 47, 54 (Utah Ct.App.1995) (reviewing "trial court's selection and statement of applicable law" for correctness). However, like the majority, I would affirm the result decided by the juvenile court—i.e., that L.W. lost her parental presumption and custody should therefore be determined solely by evaluating the children's best interests. *See Gardner,* 949 P.2d at 789 n. 2 (declaring we "may affirm the trial court on any proper ground").

## II. Due Process

L.W. maintains that, because the juvenile court initially accepted counsels' contention that bifurcation was required and tried to bifurcate the trial to some extent, she essentially lacked both notice that the children's best interests were at issue and opportunity to present evidence on that matter. She thus insists her due process rights were violated, and the majority agrees.

However, L.W.'s appellate brief states, "In this particular case the trial judge asked the parties to brief the issues of both rebuttal of the parental presumption and custody together." She then inquires "whether in the facts of this case it was improper to require briefing on the issue of custody at the time

the trial court requested it (on the second-to-last day of trial) in light of the fact that evidence on the issue of custody was, for the most part, absent from the trial." Yet, the record shows L.W. never objected to the juvenile court's request that the parties brief both issues. She said nothing about presenting further evidence on the children's best interests. Moreover, she elected to ignore the juvenile court's request for briefing on the best interests issue, submitting a brief limited to the presumption issue.[2] Thus, based on L.W.'s concession that she knew that she had been asked to brief both issues together and her failure to object to that request, I would conclude she did not preserve this issue for appeal. *See Hart v. Salt Lake County Comm'n,* 945 P.2d 125, 129–30 (Utah Ct.App.1997) ("To preserve a substantive issue for appeal, a party must first raise the issue before the trial court. ' "A matter is sufficiently raised if it is submitted to the trial court, and the court is afforded an opportunity to rule on the issue." ' " (Citations omitted.)).

## CONCLUSION

I would conclude the juvenile court should not have considered L.W.'s asserted parental presumption because she had already forfeited it by losing custody of her children in earlier proceedings. I would further conclude L.W. did not preserve for appeal her argument that she did not have notice that the juvenile court was ruling on the children's best interests and thus did not have the opportunity to present evidence on that issue. Accordingly, I would affirm the juvenile court on both issues.

---

**2.** L.W. chose an all-or-nothing strategy by hanging her hat on what she hoped would be the dispositive issue—that she would successfully defend her parental presumption against rebuttal. That strategy failed in the juvenile court.